**UNITED STATES of America, ex rel. KREINDLER & KREINDLER, Plaintiff–Appellant, Cross–Appellee,**

v.

**UNITED TECHNOLOGIES CORPORATION, Defendant–Appellee, Cross–Appellant.**

**Nos. 1363, 1756, Dockets 91–9288, 91–9380.**

United States Court of Appeals, Second Circuit.

Argued May 13, 1992.

Decided Jan. 22, 1993.

Steven R. Pounian, New York City (Milton G. Sincoff, Blanca I. Rodriguez, David L. Fiol, Kreindler & Kreindler, of counsel), for plaintiff-appellant, cross-appellee.

Patrick W. Lee, Washington, DC (Jonathan H. Pittman, Crowell & Moring, Wash-

ington, DC, Christopher Massaroni, De-Graff, Foy, Holt–Harris & Mealey, Albany, NY, of counsel), for defendant-appellee, cross-appellant.

Stuart M. Gerson, Asst. Atty. Gen. of the U.S., Washington, DC, Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., Syracuse, NY, Douglas N. Letter, Matthew M. Collette, Attys., Appellate Staff Civ. Div., Dept. of Justice, Washington, DC, for amicus curiae, U.S.

Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel, Claire M. Sylvia, Asst. Senate Legal Counsel, Washington, DC, for amicus curiae, U.S. Senate.

John R. Phillips, Hall & Phillips, Evan Caminker, U.C.L.A. School of Law, Los Angeles, CA, for amicus curiae, Taxpayers Against Fraud.

Clarence T. Kipps, Jr., Emmett B. Lewis, Mary Lou Soller, James R. Lovelace, Miller & Chevalier, Daniel J. Popeo, John C. Scully, Washington Legal Foundation, Washington, DC, for amicus curiae, Washington Legal Foundation.

Before CARDAMONE, PIERCE, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiff-appellant, cross-appellee Kreindler & Kreindler ("Kreindler"), the relator in this *qui tam* action filed on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 (1988) *et seq.* (the "FCA"), appeals from a summary judgment of the United States District Court for the Northern District of New York, Neil P. McCurn, *Chief Judge*, entered November 14, 1991 that dismissed Kreindler's complaint for failure to comply with the applicable statute of limitations. The underlying memorandum-decision and order is reported as *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 777 F.Supp. 195 (N.D.N.Y.1991).

Defendant-appellee, cross-appellant United Technologies Corp. ("UTC") cross-appeals from the district court's determination that Kreindler had standing to bring this action. UTC also contends on cross-appeal that the district court lacked subject matter jurisdiction over this suit, a contention raised below but not addressed by the district court.

We affirm on the basis of an absence of subject matter jurisdiction, viewing the suit as "based upon the public disclosure of allegations or transactions in a ... civil ... hearing" within the meaning of 31 U.S.C. § 3730(e)(4)(A) (1988), and concluding that Kreindler is not an "original source of the information" underlying this action within the meaning of § 3730(e)(4)(A) and (B).

## Background

Kreindler previously represented Audrey L. Bryant, widow of United States Army warrant officer Charles Bryant, in a wrongful death action, *Bryant v. UTC*, 83 Civ. 992 (N.D.N.Y.), brought against UTC as a result of Charles Bryant's death in the 1982 crash of a UH–60A ("Black Hawk") helicopter manufactured by UTC. In connection with the discovery in that case, Kreindler entered into a stipulation and protective order (the "Stipulation") which stated that all UTC documents provided in discovery were "confidential and proprietary information which shall be used by plaintiff solely for the purposes of [the *Bryant*] action," and were to be immediately returned to UTC or destroyed upon the final termination of that action. The *Bryant* action was settled in 1987 prior to trial. In the settlement agreement, Kreindler agreed to return all discovery documents and to honor the terms of the Stipulation. The agreement stated further that it was "binding upon Mrs. Bryant and [UTC] and their respective ... attorneys." The agreement was signed by Mrs. Bryant, an attorney for UTC, and an attorney from Kreindler.

Army design specifications for the Black Hawk required that the helicopter be capable of being transported aboard military cargo aircraft. To accomplish this, the main rotor blades had to be folded, and the blade folding and unfolding had to be done rapidly and without maintenance technicians. Because folding the blades without disconnecting the control rods attached to

them would transmit unacceptable pressure to the control assembly of the helicopter, UTC incorporated blade fold pins into its prototype helicopter design. The pins were inserted into holes in the helicopter's internal control mechanisms during blade folding. The function of these pins was to withstand and sustain the physical loads generated by folding the main rotor blades for transportation without disconnecting the attached control rods, preventing these physical loads from damaging sensitive flight control system components. The applicable contract did not specifically require blade fold pins, but did require blade folding capability.

Under Department of Defense regulation DOD–STD–480A (Apr. 12, 1978), UTC was required to seek approval from the assigned Army contracting officer for changes and waivers impacting upon safety and performance. Engineering changes to the Black Hawk design were classified as either Class I, those affecting "contractually specified form, fit or function," or Class II, minor changes not having such an effect, such as alterations in documentation or hardware. UTC was contractually required to submit Class I change requests to the contracting officer at the Army Aviation Systems Command ("AVSCOM") in St. Louis, Missouri.

In late 1977 or early 1978, UTC discovered that certain engineering changes prevented the use of blade fold pins because the prefabricated holes into which the pins were to be inserted did not line up properly. According to Kreindler, UTC unilaterally and secretly revised its design to eliminate the pins rather than refabricate the components or submit design changes to the government for approval. In addition, UTC allegedly did not propose any substitute design for protecting the flight control system from pressure generated by folding

the rotor blades. UTC contends that it abandoned the blade fold pin concept not only because of the alignment problems, but also because the final design of the helicopter made it too tall to fit into several cargo transport aircraft without disconnecting the pitch control rods connecting the blades to the control mechanisms. UTC claims that the disconnection alleviated the blade fold loads and made the blade fold pins unnecessary. UTC also maintains that the change was made with the full knowledge of the responsible Army officials.

The first Black Hawk helicopters were delivered to the Army in the summer of 1979. According to UTC, during training exercises in November 1979, UTC and the Army discovered that folding the rotor blades without disconnecting the pitch control rods exerted excess pressure that could crack ball bearings manufactured by the Fafnir Corporation ("Fafnir bearings") that were utilized in the flight control system.[1] In November 1979, UTC changed the procedure by which rotor blades could be folded, requiring the pitch control rods to be disconnected before folding "to prevent loading the control system." In December 1979, the Commander of AVSCOM circulated a memorandum to all Army field units using the Black Hawk which advised that folding the rotor blades without disconnecting the pitch control rods could damage the Fafnir bearings, and ordered the Army units to inspect all affected Black Hawks and replace any damaged bearings.

On November 6, 1979, UTC submitted an engineering change notice that called for the replacement of the Fafnir bearings in all newly produced Black Hawks with solid rollers that could withstand greater pressure. Kreindler claims that when UTC switched to solid rollers, it concealed the

1. In its complaint, Kreindler alleged that UTC discovered the problems with these bearings after an investigation of a May 1978 crash of one of its prototype helicopters. Kreindler also alleged that the Fafnir Corporation, manufacturer of the bearings, had previously issued express warnings in its technical catalogues against their use in any application during which they were subjected to a concentration of

stress. UTC contends that the warnings did not appear until the 1979 Fafnir catalogue; and that they prompted UTC to submit an engineering change notice on November 6, 1979 that called for replacement of the Fafnir bearings with solid metal rollers. The engineering change notice states that "Fafnir's latest catalog discourages the use of this bearing because hardened outer race is susceptible to cracks."

fact that the change was necessitated because the blade fold loads resulting from the lack of blade fold pins tended to crack the Fafnir bearings. According to Kreindler, UTC falsely categorized the change notice as a Class II change rather than a Class I change in order to avoid retrofitting existing helicopters. UTC contends that the change notice was prompted by the warnings put out by Fafnir in its 1979 catalogue. *See supra* note 1. According to UTC, it did not become aware of the relationship between failure to disconnect the pitch control rods and the cracked bearings until November 15, 1979, after it had submitted the change notice.

The first 115 Black Hawks delivered to the Army, for which payment was made in March 1981, contained the Fafnir bearings which could not withstand blade folding pressures without disconnection of the pitch control rods. These helicopters were eventually retrofitted with solid metal rollers in 1983, after the fatal accident that led to the *Bryant* litigation. Although the related change notice specified that safety and standards were affected, UTC classified it as a Class II change.

Kreindler filed this action on December 30, 1987, contending that UTC knowingly violated its government contract and presented false or fraudulent claims for payment of over 700 Black Hawk helicopters delivered to the United States Army without blade fold pins, a contractually required and critical safety and performance feature. Kreindler asserted that this constituted a fraud on the government under the FCA, which imposes liability upon any person who

> knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States

a false or fraudulent claim for payment or approval.

31 U.S.C. § 3729(a)(1) (1988). "Knowingly" is defined to mean that

> a person, with respect to information—
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information,
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (1988).

Kreindler filed this action under seal, as required by 31 U.S.C. § 3730(b)(2) (1988), and forwarded the complaint to the United States Department of Justice, which had the option, under 31 U.S.C. § 3730(b)(4)(A) (1988), of conducting the action. After investigation, the United States notified Kreindler and the district court, pursuant to 31 U.S.C. § 3730(b)(4)(B) (1988), that it declined to pursue the action. Kreindler then served the complaint on UTC.

UTC filed motions pursuant to Fed. R.Civ.P. 12(b)(1) and 56 which asserted that: (1) the FCA's *qui tam* provisions allowing private citizens who have not suffered actual or threatened injury to sue on behalf of the government are unconstitutional, and Kreindler thus did not have standing to sue; (2) the court lacked subject matter jurisdiction in view of § 3730(e)(4) because the suit was based upon the public disclosure of the underlying allegations in the *Bryant* action and Kreindler was not an "original source of the information" upon which the action was based within the meaning of that provision; and (3) the claim was barred by the applicable statute of limitations.[2]

The district court denied UTC's motion to dismiss on standing grounds, concluding that the government's alleged injury as a

---

**2.** The applicable limitations period is stated in 31 U.S.C. § 3731(b) (1988), which provides:
A civil action under section 3730 may not be brought—
(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known

or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
whichever occurs last.

result of UTC's conduct provided a valid basis for Congress to confer standing upon Kreindler to bring the action. 777 F.Supp. at 199–200. The court determined, however, that the action was barred by the pertinent statute of limitations, *id.* at 200–05, and accordingly declined to address the issue of subject matter jurisdiction posed by § 3730(e)(4). 777 F.Supp. at 205.

Kreindler appeals from that determination. UTC cross-appeals from those portions of the district court's decision which (1) held that Kreindler had standing, and (2) declined to dismiss the case for lack of subject matter jurisdiction pursuant to § 3730(e)(4).

## Discussion

Under the FCA, individuals are authorized to "bring a civil action for a violation of [the Act] for the [complaining] person and for the United States Government." 31 U.S.C. § 3730(b)(1) (1988). The action is brought in the name of the government, *id.*, and the government may either intervene and prosecute the action, § 3730(b)(2), or allow the original plaintiff—the *qui tam* relator—to proceed with the suit under § 3730(b)(4)(B).

Whether or not the government joins in the action, the relator is entitled to a portion of the proceeds if the prosecution is successful. If the government intervenes in the suit, the relator receives no less than fifteen and no more than twenty-five percent of the ultimate recovery. 31 U.S.C. § 3730(d)(1) (1988).[3] If the government does not join the suit, the relator receives from twenty-five to thirty percent of the recovery. 31 U.S.C. § 3730(d)(2) (1988).

We address on this appeal (1) UTC's claim that the *qui tam* provisions of the FCA violate Article III of the Constitution, and thus did not validly vest Kreindler with standing to bring this action; (2) Kreindler's contention that the district court erred in its statute of limitations ruling; and (3) UTC's argument that subject matter · jurisdiction was not proper under § 3730(e)(4)(A).

## A. *Standing.*

 UTC argues that the FCA violates Article III of the Constitution by granting standing to private individuals to sue on the government's behalf when they have not personally suffered actual or threatened injury. The district court relied, 777 F.Supp. at 199, upon three recent cases upholding *qui tam* plaintiff standing: *United States ex rel. Truong v. Northrop Corp.,* 728 F.Supp. 615 (C.D.Cal.1989); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.,* 722 F.Supp. 607 (N.D.Cal.1989); and *United States ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084 (C.D.Cal.1989).

 Article III, section 2 of the Constitution confines federal court jurisdiction to the adjudication of "[c]ases" and "[c]ontroversies" in which the plaintiff has standing to maintain the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional doctrine of standing requires the plaintiff to show actual or threatened injury resulting from defendant's conduct that is redressible by a court. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979).

Congress, however, may create a legal interest and confer standing to assert it. "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973)); *see also Trafficante v. Metropolitan Life · Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972) (White, J., concurring); *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636 (1972). In such a case, the prudential, judicially-created limi-

---

**3.** Section 3730(d)(1) also provides, however, that in a government-adopted suit based "primarily" upon a public disclosure of the type described in § 3730(e)(4)(A), any award to the *qui tam* relator may not exceed ten percent of the proceeds of the action.

tations on standing—such as individualized or particularized injury to the plaintiff—are not required, although the plaintiff must still allege some injury. "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206; *see also Gladstone*, 441 U.S. at 103 n. 9, 99 S.Ct. at 1609–10 n. 9. When Congress has extended standing under a statute to the limits of Article III, "the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that [statute]." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (citing *Gladstone*, 441 U.S. at 103 n. 9, 109, 99 S.Ct. at 1609–10 n. 9, 1612–13).

■■■ Nevertheless, some injury-in-fact must be shown to satisfy constitutional requirements, for Congress cannot waive the constitutional minimum of injury-in-fact. In a *qui tam* action, the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury. *See United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir.1992) ("The government, and not the relator, must have suffered the 'injury in fact' required for Article III standing."). "Where there is evidence of palpable injury to the entity on whose behalf and in whose name the suit is brought, it is superfluous to require that the relator be individually aggrieved." *Truong*, 728 F.Supp. at 619 (footnote omitted); *see also Stillwell*, 714 F.Supp. at 1098 ("There is no constitutional prohibition to the relator's suing, under a statutory grant of standing, on the injury to the United States."); 13A Charles A. Wright *et al.*, *Federal Practice and Procedure* § 3531.-13, at 76 (1984) ("if Congress wishes, indeed, it can enact a qui tam statute to enable a private party to invoke the standing of the government to collect a civil penalty"). Thus, the government's alleged losses from UTC's fraud confer standing on Kreindler.

■■ The government remains the real party in interest, however, in the FCA suit. As we have previously stated, "although *qui tam* actions allow individual citizens to initiate enforcement against wrongdoers who cause injury to the public at large, the Government remains the real party in interest in any such action." *Minotti v. Lensink*, 895 F.2d 100, 104 (2d Cir.1990); *see also Milam*, 961 F.2d at 49 ("We could not lightly conclude that the party upon whose standing the justiciability of the case depends is not the real party in interest.").

The *qui tam* plaintiff has the requisite personal stake in the outcome of the case to assure "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Because the *qui tam* relator: (1) funds the prosecution of the FCA suit, (2) will receive a private share in the government's recovery only upon prevailing, and (3) may be liable for costs if the suit is frivolous, the relator's personal stake in the case is sufficiently ensured. *See United States ex rel. Givler v. Smith*, 775 F.Supp. 172, 181 (E.D.Pa. 1991); *Truong*, 728 F.Supp. at 619 n. 7; *Stillwell*, 714 F.Supp. at 1098–99.

UTC argues that such an interpretation permits Congress to circumvent Article III standing requirements. Citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), UTC argues that Congress cannot authorize suit by a relator who has not suffered an injury distinct from the harm suffered by all citizens when the government is defrauded. In *Valley Forge*, however, plaintiffs claimed standing only as taxpayers or citizens. 454 U.S. at 469–70, 102 S.Ct. at 756–57. Here, by contrast, the *qui tam* relator stands in the shoes of the government, which is the real party in interest.

■■■ The traditional Article III separation-of-powers concerns, as enunciated in *Valley Forge*, 454 U.S. at 472–74, 102 S.Ct. at 758–60, are not violated by allowing *qui tam* suits under the FCA. Such suits do

not constitute an intrusion into areas committed to other governmental branches, for the courts are specifically engaged in the implementation of legislative policy. Thus, in adjudicating FCA cases, courts further the Congressional purpose of augmenting executive enforcement of fraud cases. *See Public Interest Bounty Hunters v. Board of Governors of the Fed. Reserve Sys.*, 548 F.Supp. 157, 161 (N.D.Ga.1982) (*"Qui tam* plaintiffs therefore stand in the position of 'private attorneys general' whom Congress has 'deputized' to enforce federal laws."); *see also Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 418 (1947) (Frankfurter, J., dissenting) (in *qui tam* actions, "society makes individuals the representatives of the public for the purpose of enforcing a policy explicitly formulated by legislation"); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 30 (D.C.Cir.1990) (plaintiff enforcing Fair Housing Act of 1968 acts as private attorney general vindicating Congressional policy), *cert. denied*, 498 U.S. 980, ——, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990), —— U.S. ——, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991).

Accordingly, the Supreme Court has stated that:

> Qui tam suits have been frequently permitted by legislative action, and have not been without defense by the courts....
>
> Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it; to nullify the ... statute because of dislike of the independent informer sections would be to exercise a veto power which is not ours. Sound rules of statutory interpretation exist to discover and not to direct the Congressional will.

*United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541–42, 63 S.Ct. 379, 383, 87 L.Ed. 443 (1943) (footnotes omitted). More recently, in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court, although denying citizen standing under the Endangered Species Act of 1973, 16 U.S.C. § 1531 (1988) *et seq.*, distinguished "the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the govern-ment's benefit, by providing a cash bounty for the victorious plaintiff." —— U.S. at ——, 112 S.Ct. at 2143. *See also United States ex rel. Woodard v. Country View Care Ctr., Inc.*, 797 F.2d 888, 893 (10th Cir.1986) ("The [FCA] statute of course eliminated any standing problem."); *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir.1977) (same), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). A concrete case or controversy exists, and the asserted harm is redressible by civil penalties and damages. 31 U.S.C. § 3729(a) (1988).

Finally, the FCA *qui tam* provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation. *See Truong*, 728 F.Supp. at 621–22; *Stillwell*, 714 F.Supp. at 1086–93. This multi-branch approach is consistent with the fundamental structure and concepts of the Constitution. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); *see also id.* at 610 (Frankfurter, J., concurring) ("[T]he content of the three authorities of government is not to be derived from an abstract analysis. The areas are partly interacting, not wholly disjointed.").

### B. *Statute of Limitations.*

█ As indicated *supra*, the district court dismissed this action on the basis of the applicable statute of limitations, § 3731(b) (set forth *supra* note 2), and therefore did not address the issue of subject matter jurisdiction posed by § 3730(e)(4). This procedure was inappropriate. As we stated in *Rhulen Agency, Inc. v. Alabama Insurance Guaranty Association*, 896 F.2d 674 (2d Cir.1990):

> Where, as·here, the defendant moves for dismissal under Rule 12(b)(1), Fed.R.Civ. P., as well as on other grounds, "the

court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." 5 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1350, p. 548 (1969); cf., *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction).

*Id.* at 678; *see also Jones v. State of Ga.*, 725 F.2d 622, 623 (11th Cir.) ("exceptions" to this "generally preferable approach" exist when plaintiff's claim has no plausible foundation or is clearly foreclosed by Supreme Court precedent), *cert. denied*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 316 (1984); *United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc. ("Blue Cross")*, 755 F.Supp. 1040, 1047 (S.D.Ga.) (citing *Jones*, court in *qui tam* action considered first whether § 3730(e)(4) precluded subject matter jurisdiction), *dismissed on rehearing*, 755 F.Supp. 1055 (S.D.Ga.1990).

Before we move on to the dispositive issue of subject matter jurisdiction under § 3730(e)(4), however, we will briefly state our disagreement with two aspects of the district court's discussion of the statute of limitations issue, since that discussion occurs in a published opinion that might be regarded, absent any correction or clarification by this court, as precedential in this circuit.

■ The three-year limitations period stated in § 3731(b)(2) commences on "the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." *See supra* note 2. In considering this aspect of the limitations issue, the district court stated:

The intentional concealment from the Army of the abandonment of the blade fold pin concept is the basis of relator's claim.... However, none of the helicop-

ters delivered to the Army had blade fold pins, a fact that was obvious to Army officials in 1979. There is no question of fact regarding the Black Hawk Project Manager's Office's knowledge of the alleged defect. Accordingly, the relator has no claim under the False Claims Act, since the government "knew of those very facts or characteristics" which allegedly made defendant's claims false.

777 F.Supp. at 204 (quoting *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795, 810 (D.Utah 1988)).

*Boisjoly* is not addressed to the "known or reasonably should have been known" language of § 3731(b)(2), but rather to the threshold requirement of § 3729(a)(1) that a defendant "knowingly" present a false claim to the United States government in order for FCA liability to attach. We disagree with *Boisjoly's* interpretation of § 3729(a)(1), and concur in the contrary view expressed by the Ninth Circuit in *United States ex. rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir.1991). That case expressly rejected the contention that government knowledge of the falsity of a claim automatically bars an FCA action, stating: "The requisite intent is the knowing presentation of what is known to be false. That the relevant government officials know of the falsity is not in itself a defense." *Id.* at 1421 (citing *United States v. Ehrlich*, 643 F.2d 634, 638–39 (9th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981)). The court added that *"Boisjoly* may be defensible on its facts; its dicta are an unreliable guide." *Id.*

It is unclear whether the *Boisjoly* statement at issue here is a dictum, especially since the *Boisjoly* court stated it as a holding. *See* 706 F.Supp. at 810. In any event, we agree that it is an unreliable guide. Although the ruling in favor of the defendant was warranted on the facts of that case, we agree with *Hagood* that the statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim, *see* § 3729(a) & (b), which is not automatically exonerated by any overlapping knowledge by government officials.

As the government concedes in an amicus brief addressed to this issue, on the other hand, government knowledge may be relevant to a defendant's liability:

> The fact that a contractor has fully disclosed all information to the government may show that the contractor has not "knowingly" submitted a false claim, that is, that it did not act with "deliberate ignorance" or "reckless disregard for the truth." *See* 31 U.S.C. § 3729(b). In some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not "false."

Amicus curiae brief of the United States at 16.

The district court in this case also stated that it "was not persuaded by [Kreindler's] 'continuing fraud' theory, i.e., that a fraudulent claim was made with the delivery of each helicopter, since the alleged defect in each helicopter was known to the government in 1979." 777 F.Supp. at 205. This comment occurred in the aftermath of the district court's adoption of *Boisjoly*, a case addressed to the issue of liability rather than the statute of limitations. In any event, the quoted statement does not reflect the law generally applicable with respect to the FCA statute of limitations.

■ Specifically, the number of assertable FCA claims is not measured by the number of contracts, but rather by the number of fraudulent acts committed by the defendant. *See United States v. Bornstein*, 423 U.S. 303, 311, 96 S.Ct. 523, 528–29, 46 L.Ed.2d 514 (1976); *see also Ehrlich*, 643 F.2d at 638 ("if a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures"); *United States v. Woodbury*, 359 F.2d 370, 377–78 (9th Cir.1966) (same). Further, as to each such claim, the six-year limitations period of § 3731(b)(1) "begins to run on the date the claim is made, or, if the claim is paid, on the date of payment." *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 829 (S.D.N.Y.1986) (collecting cases), *aff'd*, 817 F.2d 1007 (2d Cir.1987).

We turn to the issue of subject matter jurisdiction that we deem dispositive of this appeal.

C. *Subject Matter Jurisdiction under 31 U.S.C. § 3730(e)(4) (1988).*

Section 3730(e)(4) provides in pertinent part:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing ... unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

■ As the language of this statute makes clear, "[t]he satisfaction of ... § 3730(e)(4) is ... an issue of subject matter jurisdiction." *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir.1992) (collecting cases), *petition for cert. filed*, 61 U.S.L.W. 3437 (U.S. Nov. 30, 1992) (No. 92–927). Section 3730(e)(4) is intended to bar "parasitic lawsuits" based upon publicly disclosed information in which would-be relators "seek remuneration although they contributed nothing to the exposure of the fraud." *United States ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir.1992); *see also United States v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158, 1159 (S.D.Fla.1990) ("it will usually serve no purpose to reward a relator for bringing a *qui tam* action if the incident of fraud is already a matter of public knowledge by virtue of 'public disclosure'"), *aff'd mem.*, 963 F.2d 384 (11th Cir.1992).

■ UTC contends that discovery material containing all of the information upon which Kreindler's claim is based was filed

with the district court in the *Bryant* litigation. Although Kreindler was barred from disclosing that information by the Stipulation, the *Bryant* record was not sealed. Indeed, the district court denied a motion by UTC "for the sealing of all pleadings in this case containing copies of protected [UTC] documents." Thus, the information was publicly disclosed because it was available to anyone who wished to consult the court file.

As the Third Circuit stated in *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co. ("Prudential")*, 944 F.2d 1149, 1155–56 (3d Cir.1991), § 3730(e)(4) was "designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator. Information gleaned in litigation and on file in the clerk's office falls in this category."[4] *See John Doe*, 960 F.2d at 322 ("Potential accessibility by those not a party to the fraud was the touchstone of public disclosure [in *Prudential*.]"). *See also Wang v. FMC Corp.*, 975 F.2d 1412, 1416–17 (9th Cir.1992) (information revealed through discovery in a civil litigation "publicly disclosed" for purposes of a subsequent *qui tam* action) (citing *Prudential*, 944 F.2d at 1157–60); *Precision Co.*, 971 F.2d at 553–54 (allegations in prior civil suit "publicly disclosed" within meaning of § 3730(e)(4)(A)); *United States ex rel. Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 504 (7th Cir.1989) (same), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990). *But see Blue Cross*, 755 F.Supp. at 1048–50 (information revealed in civil litigation not disclosed "in a ... civil ... hearing" within meaning of § 3730(e)(4)(A)); *United States ex rel. Stinson, Lyons, Gerlin & Busta-*

*mante, P.A. v. Provident Life & Accident Ins. Co. ("Provident")*, 721 F.Supp. 1247, 1256–57 (S.D.Fla.1989) (civil litigation probably not a § 3730(e)(4)(A) "hearing," but case decided on other grounds).

Kreindler argues that even if the discovery material was publicly disclosed, Kreindler did not obtain the pertinent information "solely" from that material, but also through independent investigation. The phrase "solely," however, is not included in § 3730(e)(4)(A), which addresses actions "based upon" public disclosure of the underlying allegations or transactions. Further, *Precision Co.*, 971 F.2d at 552–53, explicitly repudiates the notion that § 3730(e)(4)(A) bars only actions based "solely" upon publicly disclosed information, concluding that the statute applies to a *"qui tam* action ... based in any part upon publicly disclosed allegations or transactions." 971 F.2d at 553. In addition, *John Doe* states that "[p]ublic disclosure of the allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator obtained his information." 960 F.2d at 324; *see also United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir.1990) ("if the information on which a *qui tam* suit is based is in the public domain, and the *qui tam* plaintiff was not a source of that information, then the suit is barred").

It follows that in order to avoid the statutory bar, Kreindler must satisfy the limited exception to that bar provided by § 3730(e)(4)(A) & (B) to an "original source of the information." As we stated in *Dick*, however:

In assessing the pertinent language of the statute, we note that "original source" is expressly defined in

---

4. Kreindler seeks to distinguish *Prudential* on the basis of a statement in *Prudential* that "we need not consider whether information subject to a protective order which is either advertently or inadvertently disclosed could be considered to be received pursuant to a 'public disclosure.'" 944 F.2d at 1158. As we have pointed out, however, the Stipulation in this case did not prohibit filings in court of, and thus public access to, discovery and other litigation documents. We express no view regarding the case

of a protective order that effectively precludes public access to the § 3730(e)(4)(A) "allegations or transactions" underlying a *qui tam* action. Additionally, in view of our resolution of the statutory issue of subject matter jurisdiction, we express no view regarding UTC's contention that Kreindler's *qui tam* action should be barred because it constitutes a violation of the Stipulation's mandate that material disclosed to Kreindler by UTC in the *Bryant* action be used "solely for the purposes of" that case.

§ 3730(e)(4)(B). A straightforward reading of § 3730(e)(4)(B) indicates that to be an "original source" a *qui tam* plaintiff must (1) have direct and independent knowledge of the information on which the allegations are based, and (2) have voluntarily provided such information to the government prior to filing suit. A close textual analysis combined with a review of the legislative history convinces us that under § 3730(e)(4)(A) there is an additional requirement that a *qui tam* plaintiff must meet in order to be considered an "original source," namely, a plaintiff also must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based.

912 F.2d at 16.

Kreindler does not meet these requirements. Although Kreindler conducted, as counsel, the litigation that resulted in public disclosure of information concerning Black Hawk helicopters upon which Kreindler relies to bring the *qui tam* action, UTC and its employees were the original sources of the information disclosed in that litigation. *See Prudential*, 944 F.2d at 1160 (memoranda produced in discovery constituted "public disclosure," counsel to whom memoranda produced not "original source"); *Houck*, 881 F.2d at 504–05 (relator who assisted claimants in prior litigation did not have "independent" knowledge of information ascertained via that activity, so not an "original source"); *cf. Provident*, 721 F.Supp. at 1257–58 (law firm/relator that derived primary information from independent investigation rather than discovery in prior civil litigation was "original source").

Kreindler had no significant direct knowledge regarding the Black Hawks independent of the disclosures made to Kreindler by UTC, and certainly was not a source of that information *to* UTC. The fact that Kreindler conducted some collateral research and investigations regarding the Black Hawk situation, as would be customary in such litigation, does not establish "direct and independent knowledge of the information on which the allegations are based" within the meaning of

§ 3730(e)(4)(B); UTC was clearly the source of the core information. Nor does the fact that Kreindler's background knowledge enabled it to understand the significance of the information acquired in the *Bryant* action make its knowledge independent of the publicly disclosed information. If that "were enough to qualify the relator as an 'original source,' then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase." *Prudential*, 944 F.2d at 1160.

In sum, because Kreindler's *qui tam* action is "based upon the public disclosure of allegations or transactions" in the *Bryant* action within the meaning of § 3730(e)(4)(A), and because Kreindler is not an "original source" of the pertinent information within the meaning of § 3730(e)(4)(A) and (B), there is no subject matter jurisdiction in this case.

### Conclusion

The judgment of the district court dismissing the complaint is affirmed on the basis that § 3730(e)(4) precludes subject matter jurisdiction.