**UNITED STATES of America by the DEPARTMENT OF DEFENSE, and Pentagen Technologies International Limited, Plaintiffs,**

**v.**

**CACI INTERNATIONAL INC., et al., (First Defendants), International Business Machines Corp., et al. (Second Defendants), and "John Doe" and "Jane Doe" (Third Defendants) Defendants.**

No. 94 Civ. 2925 (RLC).

United States District Court, S.D. New York.

July 6, 1995.

---

Mary Jo White, U.S. Atty. for the S.D.N.Y., New York City (David A. Koenigsberg, Asst. U.S. Atty., of counsel), for plaintiff U.S.

Joel Z. Robinson & Co., New York City (Joel Z. Robinson, of counsel), for plaintiff-relator Pentagen Technologies Intern. Ltd.

Steptoe & Johnson, Washington, DC (J. William Koegel Jr., of counsel), Owen & Davis, New York City (James M. Davis, of counsel), for defendant Caci Intern. Inc., et al.

Fried, Frank, Harris, Shriver & Jacobson, Washington, DC (John T. Boese, Laurie A. Oberembt, of counsel), Fried, Frank, Harris, Shriver & Jacobson, New York City (John A. Borek, of counsel), for defendants International Business Machines Corp. Loral Corp..

## OPINION

ROBERT L. CARTER, District Judge.

*Preliminary Statement*

Plaintiff Pentagen Technologies International Ltd. ("Pentagen") brought an action against defendant CACI International Inc. ("CACI") and other defendants as a *"qui tam"* relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3733 (Supp.1995) ("FCA" or the "Act"). Plaintiff United States of America notified the court of its intention not to intervene in the action, pursuant to § 3730(b)(4)(B).

Defendants contracted with the U.S. Army Information Systems Selection and Acquisition Agency division within the Department of Defense ("DoD") to modernize installation information management systems under the Sustaining Base Information System ("SBIS") Program, Contract Number 93–94–D0013 ("SBIS contract" or the "contract"). Pentagen claims first that defendants International Business Machines ("IBM.") and Loral Corporation ("Loral") breached the FCA by entering into the SBIS contract and continuing to submit payment claims pursuant to that contract when defendants knew or should have known that they did not have suitable software to perform the services allegedly undertaken and that they could not achieve the alleged contracted targets. More specifically, Pentagen contends that IBM/Loral was awarded a contract to deliver computer hardware and to develop and deliver computer software development methodology to use with the new hardware and that they are unable to perform as agreed because they do not have the licenses to use a number of the required tools, which will result in enormous cost overruns.[1] Defendants contend that the provisions of the SBIS contract that Pentagen claims were breached were not part of the final contract but were merely statements made by the Army and the defendants during the request for proposal process. Defendants claim that IBM/Loral and the Army negotiated final "task orders" which do not contain any of the provisions that Pentagen claims were breached.

Second, Pentagen contends that because IBM/Loral was unable to perform under the

---

1. Pentagen claims that defendants breached the contract by failing to use the "re-engineering methodology," which under certain circumstances is more cost-effective than creating entirely new software. The relator asserts that CACI, one of Loral's subcontractors, did not have the right to use the software upon which the re-engineering methodology was based and that therefore the re-engineering methodology was not used, in violation of the contract.

contract, the Army should have modified the terms of the contract or rebid the contract, and that IBM/Loral is knowingly presenting a false claim each time it receives money under the contract because it is knowingly not performing. Defendants argue that this theory is untenable because the United States remains the administrator of its own contracts; that *qui tam* relators cannot force the government to rebid its contracts; and that since the Army has decided not to modify the contract, IBM/Loral is obligated to continue performing under the contract and is thus entitled to receive its payment for its performance.

Pentagen now moves the court to enjoin the DoD and DoD's counsel from the U.S. Attorneys Office and the Department of Justice from communicating with defendants in relation to issues raised in the lawsuit; to enjoin defendants IBM and Loral from receiving any moneys from the DoD under or for work performed under the $474,000,000 SBIS Program; and in the alternative, to enjoin all further activities under the SBIS Program, pending a final decision in this litigation. The court denied all of Pentagen's motions at a hearing held on June 28, 1995, for the reasons outlined below.

### Prerequisites for Injunctive Relief

In order to obtain a preliminary injunction, Pentagen must show a) that without the injunction it will suffer irreparable harm and b) either i) likelihood of success on the merits or ii) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly towards Pentagen. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995) (citing *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991)); *In Re Puma & Sheet Metal Workers' v. Int'l Ass'n, Local Union No. 137*, 862 F.Supp. 1077, 1083 (S.D.N.Y.1994) (Car-

ter, J.). The irreparable injury complained of must be "neither remote nor speculative, but actual and imminent," *Shapiro*, 51 F.3d at 332 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)), and it must be an injury that cannot be remedied by monetary damages. *Shapiro*, 51 F.3d at 332; *Schlesinger*, 888 F.2d at 975; *see generally, EEOC v. Local 638 ...; Local 28 of the Sheet Metal Workers Int'l Ass'n*, No. 71 Civ. 2877, 1995 WL 355589 (S.D.N.Y. June 7, 1995) (Carter, J.).

### A. Injunction of Communication

■ Regarding Pentagen's request that the court enjoin the defendants from communicating with the government, the court need not address whether there is irreparable harm and likelihood of success on the merits or the existence of sufficiently serious meritorious questions and hardship tipped in favor of Pentagen because there is absolutely no basis for such an injunction in this case.

Pentagen argues that as a *qui tam* relator it has replaced the government's counsel and that Pentagen now acts as the government's attorney. As a result, Pentagen contends communication between the defendants and the government should be prohibited according to the rules of ethical conduct, and those who have already engaged in such prohibited conduct should be penalized.[2] Defendants assert that the government is not Pentagen's client and that Pentagen cannot expropriate the government's power or prohibit communications between the government and defendants. Surely defendants are correct.

31 U.S.C. § 3729 provides for a civil cause of action for fraud against the government, and § 3730(b)(1) authorizes individuals to "bring a civil action for a violation of section 3729 for the person and for the United States ..." in the name of the government. 31

---

**2.** Pentagen's reliance on *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327 (4th Cir.1989), is misplaced. In *Singer*, the Fourth Circuit held that it was not an abuse of discretion for the district court to grant a preliminary injunction requiring court approval of business transactions by an insolvent defendant. The district court required the defendant to obtain court review and approval of transactions out-

side of the ordinary course of business in order to prevent further liquidation or distribution of the defendant's assets. This case is totally inapposite because in *Singer* the court did not forbid communications between the defendant and the government and, although there was a *qui tam* relator involved, the government pursued the FCA claim and sought the injunction.

U.S.C. § 3730(b)(1). "The Government may elect to intervene and proceed with the action," 31 U.S.C. § 3730(b)(2), or it may "notify the court that it declines to take over the action, in which case the person bringing the action [the *qui tam* relator] shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4)(B); *see United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1153 (2d Cir.), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990); *United States ex rel. Mikes v. Straus*, 853 F.Supp. 115, 117 (S.D.N.Y.1994) (Broderick, J.). The purpose of the FCA is to prevent the United States Treasury from being drained of millions of dollars by fraudulent billings by federal government contractors. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5268. In furtherance of that purpose, Congress strengthened the FCA in 1986 by revamping its *qui tam* provisions to encourage private individuals to bring suits on behalf of the government. *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992); *United States ex rel. McCoy v. California Medical Review, Inc.*, 715 F.Supp. 967, 968 (N.D.Cal.1989) ("Congress' objectives in amending the Act [were] principally to expand the role of *qui tam* plaintiffs and to keep pressure on the United States to prosecute the cases") (citing S.Rep. No. 99–345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5289). Indeed, Congress noted that "much of the purpose of *qui tam* actions would be defeated unless the private individual is able to advance the case to litigation." S.Rep. No. 99–345, 99th Cong., 2d Sess. 24, reprinted *in* 1986 U.S.Code Cong. & Admin.News 5266, 5289; *see United States ex rel. McCoy*, 715 F.Supp. at 970 ("Congress clearly intended to bestow upon relators in proceedings under the Act substantial power to force the prosecution of cases.").

While Congress has made it clear that *qui tam* relators should be able to effectively bring civil suits under the FCA, it does not follow that once the government has decided it will not intervene, it is relegated to the position of the relator's client. 31 U.S.C. § 3730(c)(3) states that "[i]f the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action." However, the statute also recognizes that even where the government does not intervene, the government maintains the right to be served with copies of all pleadings filed in the action and to be supplied with all deposition transcripts, 31 U.S.C. § 3730(b)(2); to limit discovery under certain circumstances, 31 U.S.C. § 3730(c)(4); to later intervene in the action if it so desires, upon a "showing of good cause" and "without limiting the status and rights of the person initiating the action," 31 U.S.C. § 3730(c)(3); to settle the action with the defendants over the objections of the individual bringing the action, 31 U.S.C. § 3730(c)(2)(B); and finally, to seek dismissal of the case. 31 U.S.C. § 3730(b). There is nothing in the FCA's language which prohibits the government from communicating with the defendants or submitting an *amicus curiae* brief on their behalf, and Pentagen has not shown how the government's alleged communications with the defendants would interfere with Pentagen's right to conduct the lawsuit or limit Pentagen's status.

While the *qui tam* relator is empowered as a private prosecutor, it is not empowered to replace the government. *United States ex rel. Kreindler & Kreindler*, 985 F.2d at 1155 ("the FCA *qui tam* provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation"); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 760 (9th Cir.1993), *cert. denied*, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994) ("the fact that relators sue in the name of the United States does not mean that they wield government powers.... The fact that relators sue in the name of the government is significant only with respect to their standing to sue...."); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir.1994) ("although a relator may sue in the government's name, the relator is not vested with governmental power"); *see, e.g., Juliano v. Federal Asset Disposition Ass'n ("FADA")*,

736 F.Supp. 348, 351 (D.D.C.1990), *aff'd without op.*, 959 F.2d 1101 (D.C.Cir.1992) (where government moved to dismiss some FCA defendants, court held that FCA does not require government to either take over action or to completely remove itself from action; government can proceed in "hybrid" fashion). There is nothing in the FCA which gives the relator power over the conduct of government officials.

Furthermore, communications between defendants and the government are common in actions where the government has not intervened in a FCA action. *See, e.g., United States ex rel. McCoy v. Seaward Marine Servs., Inc.*, 972 F.2d 344, No. 91–1642, 1992. WL 182816, at **2 (4th Cir. Aug. 3, 1992) (U.S. Navy division head testified for FCA defendant); *United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 718 (9th Cir.1994) (government participated in FCA discussion over settlement between *qui tam* relator and defendant in order to protect government's own interest); *United States ex rel. Sequoia Orange Co. v. Sunland Packing Co.*, CV–F–88–566, Mem. of P. & A. in Supp. of the U.S.'s Mot. to Dismiss at 5–6 (E.D.Cal. Oct. 28, 1988) (government conducted lengthy settlement discussions with relator and defendants in attempt to prevent relator's harming government interests).

■ Limiting or denying the government's right to communicate with the defendants would raise serious constitutional issues. Where a *qui tam* relator's powers have been challenged under the United States Constitution, the courts have concluded that the relator's power is permissible because it does not trump that of the executive branch. *See, e.g., Boeing Co.*, 9 F.3d at 755; *Gen. Elec. Co.*, 41 F.3d at 1041; *United States ex rel. Kreindler & Kreindler*, 985 F.2d at 1155. In *Boeing*, the Ninth Circuit analogized the power of a *qui tam* relator to that of an independent counsel under the Ethics in Government Act ("EGA") of 1978, Pub.L. No. 95–521, 92 Stat. 1824 (codified as amended in scattered sections of U.S.C.). 9 F.3d at 751–755. Holding the independent counsel provisions constitutional, the Supreme Court concluded in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), that expansion of the authority of someone appointed pursuant to the EGA beyond that "specifically authorized by the Act . . . would have serious constitutional ramifications." 487 U.S. at 684, 108 S.Ct. at 2615. Here, giving the relator the power to control or extinguish communication between the government and defendants would be expanding the relator's power beyond that specifically authorized by the FCA, and would therefore be unconstitutional.

Thus, Pentagen's motion to enjoin communication between the government and defendants in relation to issues raised in this lawsuit is denied.

### B. *Injunction of Payments and Performance under SBIS Contract*

■ Pentagen claims that there is an irreparable injury to the public which cannot be remedied through monetary damages alone, thereby making an injunction against future performance and payments pursuant to the SBIS contract necessary. In particular, Pentagen contends that if the injunction is not granted, the public will suffer because the purposes of the FCA in punishing wrongdoers and deterring fraud will not be carried out. The Second Circuit recognizes that "[a] significant risk of irreparable harm to the public" may justify a preliminary injunction. *Standard & Poor's Corp. v. Commodity Exch.*, 683 F.2d 704, 711 (2d Cir.1982) (recognizing that courts "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved") (quoting *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir.1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976)). Furthermore, "[a] federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction. Of course, only a violation that can be anticipated or is likely to occur properly may be enjoined." 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948, at 460–61 (1973).

Pentagen has not shown that the public will suffer if the injunction is not issued. If the court determines that defendants are indeed defrauding the government, the civil and treble damages that the government may recover under the False Claims Act, § 3729(a), will serve to punish the defendants for their fraudulent conduct and to deter others from doing the same. Pentagen contends that the injunction would prevent defendants from continuing to "reap the fruits" of false claims and from "pour[ing] salt on the wound" of taxpayers. However, the court has not determined that defendants are guilty and Pentagen has not proven that a FCA violation is likely, making this argument purely speculative. Instead of preventing FCA violations, the injunction may in fact prevent defendants from making progress in their modernization of the Army's computer systems. In addition, Pentagen argues that the injunction should be imposed in order to combat private citizens' hesitation to bring FCA claims out of fear that nothing will result from their actions. The court's refusal to grant an injunction does not mean that nothing will come of the suit; indeed, there may be extensive monetary damages awarded to the relator which will only serve to encourage private citizen suits.

Pentagen also asserts that if an injunction is not granted the defendants will be able to use the money that they receive from the SBIS contract to finance this litigation and that Pentagen, which is significantly more impoverished than the defendants, will suffer as a consequence. However, Pentagen has alleged that the defendants have a combined net worth of $142 billion, rendering it extremely unlikely that without the contract money they would not be able to finance this litigation. Furthermore, it is difficult to see how the defendants' ability to defend themselves results in harm to Pentagen.

In sum, Pentagen has not proven that it or the public will suffer irreparable injury; therefore, the court denies Pentagen's motion to preclude SBIS contract performance and payments.

Given the court's determination that Pentagen did not meet the first requirement of a preliminary injunction, it is not necessary to analyze the other prerequisite factors: the likelihood of success on the merits or the existence of sufficiently serious meritorious questions and the balance of the hardships. In any event, upon hearing arguments from both sides at the June 28, 1995 hearing, it became clear that the contentions on which plaintiff would rely to establish likelihood of success on the merits are too speculative for the court to make a reasoned judgment.

**IT IS SO ORDERED.**

*Addendum*

Plaintiff has submitted to the court since the June 28, 1995 hearing two letters, both dated July 3, 1995: one enclosing a copy of a letter from the Assistant Secretary of Defense to Senator Strom Thurmond, dated May 18, 1995; and the other a copy of the so-called "Lakey Memo," dated May 31, 1994. The plaintiff contends that the memo refutes every declaration filed in support of the IBM contract at the June 28, 1995 hearing. Treating the letters as a motion for rehearing, the motion is denied. The content of the letters may have some bearing on the merits of the complaint if and when that matter comes to trial. However, it has not altered in any way the plaintiff's failure to meet the prerequisites for securing injunctive relief.