UNITED STATES OF AMERICA, ex rel. R.A. MCELMURRAY, III, G. William Boyce, and David L. Lewis Plaintiffs

v.

THE CONSOLIDATED GOVERNMENT OF AUGUSTA-RICHMOND COUNTY, Defendant

No. 1:05 CV 1575 ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 30, 2006.

Anthony C. Lake, Craig A. Gillen, Gillen, Parker & Withers, Francis Edwin Hallman, Jr., Richard A. Wingate, Decker, Hallman, Barber & Briggs, Mina Rhee, U.S. Attorney's Office, Atlanta, GA, for Plaintiffs.

*ORDER*

ORINDA D. EVANS, District Judge.

This civil case arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3731 (2000). Plaintiffs assert in their complaint that Defendant violated the False Claims Act by knowingly misrepresenting its compliance with state and local environmental laws in order to receive three loans, the funds for which originated with the Environmental Protection Agency ("EPA"). Defendant filed a Motion to Dismiss [# 16] on March 29, 2006. Defendant argues that Plaintiffs' claims fail because (1) Plaintiffs' claims are barred by the FCA's statute of limitations; (2) Defendant's alleged false certifications of compliance with environmental laws were not "material" to approval of the loans; (3) Plaintiffs' claims are based upon public disclosures and Plaintiffs are not the origi-

nal source as the FCA requires; (4) Plaintiffs failed to plead fraud with particularity; and (5) Plaintiffs do not allege that the government has suffered any cognizable damages. The Court finds that Plaintiff's claims are based on public disclosures and Plaintiffs are not the original source of the information on which they base their claims, Defendant's motion is GRANTED. Because this determination deprives the Court of subject matter jurisdiction under the FCA, Defendant's other arguments will not be addressed.

## I. *Factual Background*

The following facts are taken from Plaintiffs' Complaint and exhibits thereto and are assumed to be true for purposes of ruling on the instant motion.[1]

The Consolidated Government of Augusta–Richmond County ("Defendant") is the successor by consolidation to the City of Augusta, Georgia, a municipal corporation. Plaintiff R.A. McElmurray, III is an employee and the owner of a dairy farm in Richmond and Burke Counties, Georgia. Plaintiff George William Boyce owned and operated a dairy in Burke County, Georgia, from 1946–2003. Plaintiff Dr. David L. Lewis was a senior-level Research Microbiologist in the Office of Research and Development for the Environmental Protection Agency ("EPA") in Athens, Georgia, for thirty-one years and until May 2003. His research at the EPA included wastewater treatment and pollutants from wastewater treatment plants.

### A. *The Butler Creek Water Pollution Control Plant/Messerly Wastewater Treatment Plant*

Defendant owns and operates the Butler Creek Water Pollution Control Plant (hereinafter "Butler Creek WPCP") and its predecessor and now-subcomponent, the Messerly Wastewater Treatment Plant ("Messerly WWTP") in Augusta, Georgia. The Butler Creek WPCP receives and treats "influent" comprised of human and industrial wastes from the Augusta municipal area. The Butler Creek WPCP treats the influent by removing solids and contaminants from the sewage and retaining them as "sludge." After the solids are removed from the sewage, the Butler Creek WPCP ultimately deposits the resulting "effluent" into the Savannah River.

### 1. *NPDES Permits*

Under the Georgia Water Quality Control Act, O.C.G.A. § 12–5–21, the Environmental Protection Division of the Georgia Department of Natural Resources ("Georgia EPD") is responsible for regulating the volume and contents of effluent from each WPCP and WWTP in the state by requiring them to obtain a National Pollution Discharge Elimination System ("NPDES") permit before they may discharge into the public waters. As a condition for the discharge of effluent, NPDES permits, effective for five year periods, set WPCP— and WWTP-specific effluent limitations and monitoring and reporting requirements. The penalties for noncompliance with a NPDES permit include enforcement action by the Georgia EPD; permit termination, revocation and reissuance; permit modification; or denial of a permit renewal application.

Included among the limitations in a typical NPDES permit are per-day discharge limitations for common contaminants contained in effluent. For example, the 2001–2006 NPDES permit for the Butler Creek WPCP, number GA0037621, limits the concentrations contained in the WPCP discharge to a monthly average of 3494 kilo-

---

1. In considering a motion to dismiss, the court will accept as true all facts set forth in the plaintiff's complaint, including the pleadings and exhibits attached thereto. *See Thaeter v. Palm Beach County Sheriff's Office,* 449 F.3d 1342, 1352 (11th Cir.2006).

grams of total suspended solids per day and a monthly average of 200/100 ml of fecal coliform bacteria. *See* Exhibit 11–6 at 7.[2]

Another limitation set by NPDES permits addresses the pretreatment program that is federally mandated[3] for each high-flow-volume[4] WPCP or WWTP that has industrial users of its sewage treatment system. Industrial dischargers must pretreat the effluent from their facilities before passing it to the WPCP for processing. Each WPCP is responsible for monitoring the nature, character and volume of pollutants contributed by industrial users to its influent and for regulating wastewater discharges from industrial users through user-specific discharge permits or similar mechanisms. Each WPCP also must inspect and carry out surveillance on the industrial users within its purview and report industrial users who do not comply with pretreatment requirements to the local newspaper with highest circulation once a year.

NPDES permits also set requirements for the monitoring and disposal of sewage sludge. These requirements include monitoring the volume and concentration of sludge removed from the WPCP and developing and implementing procedures for year-round disposal of the sludge.

### 2. *History of Noncompliance*

The Messerly WWTP has been responsible for processing Defendant's municipal wastewater for several decades. The Messerly WWTP began to experience problems with its treatment of wastewater before the late 1970s. A Georgia EPD inspection in 1977 revealed that the Messerly WWTP was "on the verge of a serious breakdown," with "chronic problems," which included "excessive solids buildup, inadequate spare parts" for repair of aging machinery, "failure of anaerobic digestion, and insufficient monitoring of industrial waste." *See* Exhibit 3–1 at ARC 00910–00911. The Messerly WWTP's problems persisted into the 1990s and beyond. Between 1991 and 2004 alone the Messerly WWTP failed to comply with its NPDES permits and consent orders imposed upon it approximately eighty-two times. *See* Exhibit 2. These violations range from exceeding the NPDES permits' monthly limit for particular contaminants contained in effluent and failing to administer and implement its Industrial Pretreatment Program to allowing "major spills" of contaminants and failing to timely complete promised construction projects for improved performance of the WWTP. *Id.*

The Messerly WWTP's operational deficiencies resulted in chronic violation of its NPDES permits. By the early 1990s, these chronic violations necessitated a series of Georgia EPD Administrative Orders and Consent Decrees against the Messerly WWTP demanding that the WWTP comply with its permits.

---

**2.** The Court derives much of this Factual Background section from Plaintiffs' extensive exhibits to the Complaint. Each exhibit has numbered pages in a different format. For example, some of the NPDES permits that comprise Exhibit 11 are numbered by the Georgia EPD as "Page 1 of 13." Other exhibits, such as those that comprise Exhibit 2, are bates-numbered (e.g. "EPD 18748") because they apparently were obtained through discovery in previous litigation. Because there is no other way to refer to specific pages in the exhibits, the Court must refer to page numbers in each exhibit in the varying formats supplied by Plaintiffs in the exhibits themselves.

**3.** *See* 40 C.F.R. § 403.8 (2006).

**4.** Currently, wastewater treatment facilities with a total design flow greater than five million gallons per day (mgd) must develop a pretreatment program to deal with pollutants from industrial users. *Id.*

On May 11, 1994, Augusta notified the Georgia EPD of its long-term plan of achieving compliance with its NPDES permits-and, ostensibly, ending the period of chronic violations- by building a constructed wetlands system for "nitrogen removal and effluent polishing." Exhibit 11–5 at EPD 04783. The Messerly WWTP's 1996 NPDES permit reflected its plans to construct a wetlands system and also dubbed the Messerly WWTP and adjacent constructed wetlands, collectively, the "Butler Creek WPCP" *Id.; see also* Exhibit 11–4.

Two years later, Defendant had begun construction on the wetlands system, but it became clear that until the wetlands were completed the Butler Creek WPCP would continue to discharge effluent the contents of which exceeded the contaminants limit set in the facility's NPDES permit. The Georgia EPD worked with Defendant in 1998 to establish new, more realistic discharge levels but also a schedule for construction and completion of the wetlands system. *See* Exhibit 11–5 at EPD 04784. The resulting Consent Order, EPD–WQ–3469, required Defendant to complete Phase II of the wetland system and thus the Butler Creek WPCP by October 1, 2000. *See id.* at EPD 04786. Furthermore, the Consent Order modified the existing NPDES permit and provided that, from the date of the Consent Order, April 1, 1998, until January 1, 2001, the Butler Creek WPCP could discharge contaminants at a higher-than-usual concentration. *Id.* at EPD 04786–04787. The Consent Order set stipulated penalties for violation of these more lenient discharge restrictions. *Id.* at EPD 04787.

The Butler Creek WPCP failed to meet even the relaxed standards. As a result, the Georgia EPD audited the facility during the week of December 7–11, 1998. *See* Exhibit 2–37 at AUG 002371. The Georgia EPD auditors discovered that there had been little improvement at the Messerly WWTP since 1977. They noted that the WWTP was "deficient in several important areas" which "when considered comprehensively show a dramatic deterioration in plant performance, maintenance and management." Exhibit 2–36 at CO 0566. These deficiencies were particularly problematic, according to the Georgia EPD, because "the facility is regularly impacted by high strength waste from industrial contributors to the sewerage system as well as a large number of septic tank haulers." *Id.* Overall, the Georgia EPD auditors concluded that "the Butler Creek WPCP is in immediate need of a strong Capital Improvement Plan that sets firm schedules for the evaluation and installation of necessary plant equipment." *Id.*

Throughout 2000 and into January 2001, the Georgia EPD closely monitored Defendant's compliance with its NPDES permit and existing Consent Orders and proposed and imposed other Consent Orders to enforce the NPDES permit's requirements. *See* Exhibits 2–42, 2–43, 2–44, 2–45. By early 2001, Defendant had made several changes in the operation of the Butler Creek WPCP. In 1999, Defendant outsourced operation of the Butler Creek WPCP to a private company, OMI Inc. *See* Exhibit 2–46. From the date it was first hired to run Defendant's wastewater treatment facilities, OMI Inc. preemptively reported NPDES permit violations to the Georgia EPD and explained to the Georgia EPD why these violations occurred. *See e.g.* Exhibits 2–47, 2–48, 2–49. Additionally, by April 2001 several new cells in the constructed wetlands were operational and had begun to receive a portion of the WPCP's effluent flow, although the vegetation in those cells had not yet reached full maturity. *See* Exhibit 2–47.

In January 2001 the Georgia EPD issued a new NPDES permit for the Butler Creek WPCP and returned the facility to

its pre–1998 discharge levels. Exhibit 11–6. Despite the changes put in place by Defendant, the Butler Creek WPCP violated the effluent limitations of its new NPDES permit numerous times between 2001 and 2003 and paid monthly fines imposed by the Georgia EPD for these violations. *See* Exhibit 2–51 at EPD 18748–18751, Exhibits 2–54, 2–55, 2–56, 2–58, 2–59, 2–60, 2–65, 2–66, 2–67, 2–68, 2–70, 2–71, 2–72, 2–73, 2–74, 2–76, 2–77.

The Butler Creek WPCP was not the only wastewater treatment facility run by Defendant that experienced problems in recent years. The Spirit Creek WPCP also discharged effluent that was impermissibly high on at least two occasions: one in January 2002 and one in September 2004. Exhibit 2–61, 2–80. In fact, by 2003, the Spirit Creek WPCP operated under its own Consent Order (EPD–WQ–4225) under which Defendant was fined $2000 for each month the Spirit Creek WPCP failed to meet its NPDES permit effluent limitations. *See* Exhibit 2–80. Defendant also experienced a number of sewer failures which resulted in unauthorized discharge of contaminants into the public waters, for which Defendant was fined $7,700 in September 2002 and $17,100 in June 2003. Exhibit 2–69, 2–78.

The Georgia EPD was not the only organization to notice Defendant's poor environmental record. In addition to Plaintiffs' own individual lawsuits against Defendant for environmental violations (discussed below), the Georgia Environmental Organization, Inc. brought a citizen suit against Defendant's predecessor the City of Augusta for violations of the Clean Water Act. *See* Exhibit 18. In *Georgia Environmental Organization, Inc. v. City of Augusta,* the United States District Court for the Southern District of Georgia granted the Georgia Environmental Organization's motion for summary judgment in that case on January 15, 1997. *Id.* at 20.

### B. *Industrial Pretreatment Program and Land Application of Sludge Program*

The month-by-month effluent violations mentioned in detail in above were likely caused by the Butler WPCP's longstanding deficiencies in two specific areas: administration of the Industrial Pretreatment Program and land application of wastewater sludge.

#### 1. *Industrial Pretreatment Program*

The Code of Federal Regulations mandates that each Publicly Owned Treatment Works (POTW) designed for a total flow of five million gallons of wastewater per day must develop a Pretreatment Program "to control pollutants which pass through or interfere with treatment processes ... or which may contaminate sewage sludge." 40 C.F.R. §§ 403.1, 403.8. In Georgia, the NPDES permit for each WWTP addresses Industrial Pretreatment standards for that facility and imposes responsibility for monitoring industrial users who contribute to the influent for each facility. The NPDES permits make it clear that the WWTP's duty to monitor industrial users is for the protection of the WWTP as well as the public waters. Uncontrolled flow of untreated wastewater from industrial users causes a number of harmful effects, including interference with the operation of the WWTP, excess pollutants passing through the wastewater treatment process in violation of the WWTP's NPDES permit-imposed limitations, contamination of municipal sludge, and harm to aquatic life in the public waters that are the ultimate destination of municipal effluent. *See* Exhibit 11–3 at ARC 05823.

From the inception of the federal Pretreatment Program requirements in 1981

to the present day, the NPDES permits for the Messerly WWTP, and later the Butler Creek WPCP, have grown increasingly specific with respect to Defendant's responsibility for monitoring Industrial Users' contribution to the influent to that facility. For example, the 1982–1987 NPDES permit for the Messerly WWTP, permit no. GA0020087, instructs the WWTP very generally, to "require all industrial dischargers . . . to meet State and Federal Pretreatment Regulations." Exhibit 11–1 at ARC 01815. By contrast, the 1986–1991 NPDES permit for the Messerly WWTP, permit no. GA0020087, imposes a list of duties on Defendant with respect to its Industrial Pretreatment Program. See Exhibit 11–2 at ARC 03795–03797.[5] The NPDES permit makes clear that Defendant should be active in its supervision of industrial users' contribution to the influent. Id. The 2001–2006 NPDES permit for the Butler Creek WPCP, permit no. GA0037621, clarifies even further the requirements imposed on the WPCP with respect to Industrial Pretreatment.[6] Together, the NPDES permits make clear that the WPCP's intended role in management of the Industrial Pretreatment Program is an active one.

Despite the monitoring and management requirements imposed on the Messerly WWTP and the Butler Creek WPCP by successive NPDES permits, the facility repeatedly fell short of the Georgia EPD's expectations with respect to its Industrial Pretreatment Program. As early as 1978, the Georgia EPD notified Defendant that the Messerly WWTP's monitoring of industrial wastes was "insufficient." Exhibit 3–1 at ARC 00910. After its December 1998 audit of the entire Messerly WWTP, the Georgia EPD noted that there was "marginal implementation and administration of the Pretreatment Program." Exhibit 16 at GCL 00048.[7]

In 1999 the Georgia EPD audited the Messerly WWTP's Industrial Pretreatment Program as a follow-up to its facility-wide audit in 1998. At that time, the Georgia EPD concluded that the WWTP's Industrial Pretreatment Program was "in significant non-compliance" with federal and state pretreatment regulations. Exhibit 3–3 at EPD 15359.[8] The Georgia EPD felt it necessary to inform the WWTP that it "expects Augusta to take

5. These duties include: "[m]aintain[ing] and updat[ing] records identifying the nature, character, and volume of pollutants contributed by industrial users to the POTW" and, where necessary, granting discharge permits and imposing compliance schedules for industrial users who do not meet the local pretreatment standards. Exhibit 11–2 at ARC 03795.

6. For example, the 2001–2006 permit makes clear that "compliance schedules will be required" of industrial users who do not meet applicable pretreatment standards. Exhibit 11–6 at 20.

7. The Georgia EPD found that discharge permits for industrial users were not being issued. Exhibit 16. The industrial users that had received permits from the WWTP were not categorized correctly by industry, with the effect that the WWTP was not thoroughly monitoring certain industry-specific pollutants. Id. Furthermore, the WWTP assigned only one person to administer the Pretreatment Program and one person to inspect the forty significant industrial users whose effluent was processed by the WWTP. Id.

8. The Georgia EPD noted that the WWTP calculated noncompliance by its significant industrial users only once a year, rather than once a quarter, and thus discovered only on an annual basis whether its industrial users were flooding the influent with pollutants that the WWTP may have been incapable of processing. See Exhibit 3–3 at EPD 15361. Furthermore, the Georgia EPD learned that the WWTP had discovered violations by certain industrial users as early as 1996 and 1997 and had not taken action against those industrial users in the intervening years. Id.

enforcement for *all* violations of any effluent limitation contained in each [Industrial User's] permit," and noted that thus far "these enforcement actions ha[d] not been taken." *Id.* at EPD 15360.

In its report after the Pretreatment Audit Inspection in 1999 the Georgia EPD also detailed some of the effects of the WWTP's failure to monitor industrial users' contribution to the wastewater it treats. To cite two among several examples, Defendant's failure to address the high concentrations of hydrogen sulfide discharged in the effluent of one industrial user, NutraSweet, resulted in corrosion of many of the WWTP's metal structures and caused at least one sewer line to be replaced. *Id.* at EPD 15363. Defendant also failed to require another industrial user, Alternate Energy Systems, to monitor the molybdenum in its effluent, despite the fact that molybdenum is a limited metal for land application of sludge purposes and is a common industrial coolant and likely to be found in Alternate Energy Systems' effluent. *Id.* at EPD 15362.

2. *Land Application of Sludge Program*

Section 405 of the Clean Water Act ("CWA"), 33 U.S.C. § 1345, addresses the disposal of sludge from wastewater treatment plants and authorizes the EPA to regulate regarding the uses for and disposal of sludge. *See* 33 U.S.C. § 1345(d). The EPA's regulations implementing this section of the CWA outline three ways to use or dispose of sewage sludge: 1) land application of sludge; 2) de-watering of sludge and placing it on a surface disposal site (landfill); and 3) firing it in a sewage sludge incinerator. 40 C.F.R. § 503.1 The EPA authorizes local authorities to select which use or disposal practice they will adopt for their sewage sludge. 40 C.F.R. § 503.6. The EPA also authorizes state and local governments to impose requirements on WWTPs within their jurisdic-

tions for the use or disposal of sewage sludge. 40 C.F.R. § 503.5(a).

As it is authorized to do under the Clean Water Act and the Georgia Water Quality Control Act, the Georgia EPD has promulgated a series of requirements for land application of sewage sludge. *See* GA. COMP. R. & REGS. 391–3–6.17 (2006). The Georgia EPD defines land application of sludge as "the spraying or spreading of sewage sludge on the land surface; the injection of sewage sludge below the land surface; or the incorporation of sewage sludge into the soil at agronomic rates for purpose of soil conditioning or fertilization of crops or vegetation grown in the soil." *Id.* at (2)(u). Land application of sludge is considered a "beneficial use" of sludge, but it is only beneficial if the pollutants in the sludge are carefully monitored, both per-application and cumulatively over a series of applications. *Id.* at (1), (5)(a)(2).

The Georgia EPD regulates the concentration of pollutants in land-applied sludge on a statewide basis. The Georgia EPD sets pollutant concentration limits both per-application and for cumulative applications over months and years. *See id.* at (5)(a)(1), Tables 2 and 3. The Georgia EPD is particularly concerned with the presence of certain metals in sewage sludge, including copper, lead, mercury, nickel and zinc. *Id.* The Georgia EPD monitors pollutant concentration in land-applied sludge on a facility-by-facility basis via specific restraints in each facility's NPDES permit. *Id.* at (4)(a).

In 1980, Defendant chose to adopt land application as its disposal method for the sludge generated by its wastewater treatment plants. Exhibit 9 at ARC 01489. Defendant chose land application because it was less expensive than de-watering the sludge for disposal at a landfill and also because Defendant believed the sludge as applied to land around Augusta would be a

resource to help grow crops rather than mere waste accruing in a landfill. *Id.*

The NPDES permits for the Messerly WWTP and the Butler Creek WPCP have contained provisions for sludge disposal since at least 1982. The 1982–1987 NPDES permit for the facility required that the Messerly WWTP comply with the Georgia EPD's Sewage Sludge Requirements and submit a proposal for disposal of municipal sewage sludge by land application before beginning land application. Exhibit 11–1 at ARC 01805. The 1993–1998 NPDES permit imposed sludge monitoring requirements for the first time, requiring the Messerly WWTP to "develop and implement procedures to insure adequate year-round sludge disposal" and to "monitor the volume and concentration of solids removed from the plant." Exhibit 11–3 at ARC 05810. The 2001–2006 NPDES permit uses the same language the 1993–1998 permit does and the same monitoring requirements apply. *See* Exhibit 11–6. In all NPDES permits for the Messerly WWTP from 1982 to the present, the Georgia EPD requires the WWTP to dispose of its sludge in accordance with the CWA and the Resource Conservation and Recovery Act of 1976 as well as the EPA's guidelines.

After the Messerly WWTP's operational deficiencies and especially its problems with management of its Industrial Pretreatment Program came to light in the late 1980s and early 1990s, the Georgia EPD and other environmental experts turned their attention to the WWTP's program for disposing of sewage sludge by land application. During an audit of the Messerly WWTP in December 1998, the Georgia EPD recognized a direct relationship between the poor management of the Industrial Pretreatment Program at the Messerly WWTP and the high concentration of contaminants in the sewage sludge being generated by the facility. The Geor-

gia EPD had long before noted in the WWTP's NPDES permit that uncontrolled flow of untreated wastewater from industrial users causes contamination of municipal sludge. *See* Exhibit 11–3 at ARC 05823. As part of the December 1998 audit, the Georgia EPD discovered a high level of sulfides in the sludge generated by the Messerly WWTP and observed that the sludge was "highly corrosive ... to the point that the sludge cannot be applied up to the fence lines because it will rust the barbed wire fences." Exhibit 16 at GCL 00049. During its February 1999 audit of the Messerly WWTP's Industrial Pretreatment Program, the Georgia EPD found that the effluent from at least one Significant Industrial User, NutraSweet, contained high concentrations of hydrogen sulfidea problem that necessitated replacement of at least one sewer line and which Defendant had failed to adequately address. Exhibit 3–3 at EPD 15363.

The Messerly WWTP's land application program was in violation of Georgia EPD regulations as well as its own NPDES permits. After it discovered the state of the land application program at the Messerly WWTP in December 1998, the Georgia EPD recommended that "the land application program be shutdown [sic] immediately and should remain down until the Pretreatment Program has been brought up to speed." Exhibit 16 at GCL 00050. The Georgia EPD declared that "[t]he City should be required to de-water the sludge and landfill it." *Id.* Further, the Georgia EPD stated that "[i]n the future, the City should not be allowed to land apply sludge" and "a reliable contract operator" should be hired instead to run the land application program. *Id.*

Plaintiffs McElmurray and Boyce, relying on Defendant's alleged assurances that sewage sludge was a safe and beneficial fertilizer, allowed Defendant to apply sew-

age sludge to their farmlands as part of the Messerly WWTP's land application program. McElmurray allowed Defendant to apply sludge from the Messerly WWTP on his lands from 1979–1990. Compl. at 11. Boyce allowed Defendant to apply sludge from the Messerly WWTP to his lands from 1986–1996. *Id.* Plaintiffs both maintained dairy herds on their farms. *Id.* at 8.

Plaintiff McElmurray began to experience elevated morbidity and mortality with his dairy herd in the late 1980s and early 1990s. Exhibit 10–2 at 2. Plaintiff Boyce began to experience elevated morbidity and mortality with his dairy herd in the mid-to late–1990's. Exhibit 10–1 at 2. At the time their dairy herds began to experience increased rates of illness and death, both Plaintiffs were feeding their cattle home-grown silage, grown on the same lands to which Defendant was applying sewage sludge from the Messerly WWTP. *See* Exhibit 10–1 at 9; Exhibit 10–2 at 10. When Plaintiffs stopped feeding their dairy herd home-grown silage, Plaintiffs' shared veterinarian perceived a decrease in morbidity and mortality rates for the herds. *See* Exhibit 10–1 at 9–10; Exhibit 10–2 at 10. After Plaintiffs Boyce and McElmurray established a causal link between the morbidity and mortality rates in their dairy herds and Defendant's application of sewage sludge to their farms, they ended their participation in the land application program and later sued Defendant in their individual capacities in Richmond County Superior Court in 2001.[9] Compl. at 11–12.

Plaintiffs were not the only ones to causally connect sludge application to their lands and the increased rates of illness and death in dairy herds. In its December 1998 audit of the Messerly WWTP the Georgia EPD noted the high concentration of sulfides in the sludge generated by the Messerly WWTP and opined that "[t]he presence of sulfides in the sludge could be causing the health problems in the dairy cattle." Exhibit 16 at GCL 00050. An engineer hired by Plaintiffs as part of their separate state court litigation analyzed Plaintiffs' farmland and concluded that, beginning in the mid— to late–1980s, "Defendant loaded the [Plaintiffs'] lands with sludge containing metals and other constituents from industrial facilities and associated contaminants at levels that were, in some cases, well in excess of 10 times the safe levels recommended by the scientific community." Exhibit 5–1 at 8, 14; *see also* Exhibit 5–2 at 8, 14.

### C. *Federal Loans Administered by GEFA*

Beginning in 1992, Defendant applied for and obtained three loans from the Director of the Georgia EPD to fund improvements to its municipal water treatment facilities. *See* Exhibit 1. These loans originated with the EPA, which is authorized under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1381 *et seq.*, as amended by the Water Quality Act of 1987, to disburse capitalization grants to state agencies like the Georgia Department of Natural Resources. Exhibit 1–2 at GEFA 00199. The EPA and the Georgia EPD entered into a capitalization grant agreement to establish a revolving fund of the kind intended by the Federal Water Pollution Control Act, to assist local governments in the construction of publicly owned sewer systems and other water treatment facilities. *Id.* The Georgia EPD contracted with the Georgia Environmental Facilities Authority ("GEFA") to pro-

---

**9.** Plaintiff Boyce received a favorable jury verdict in his state court case in June 2003. Compl. at 22. Plaintiff McElmurray's case apparently has not yet been resolved. *See McElmurray v. Augusta–Richmond County,* 274 Ga.App. 605, 618 S.E.2d 59 (2005).

vide certain matching funds for the loans and to provide financial administration services for the revolving fund loans disbursed to local governments in Georgia under the federal program. *Id.*

1. *1992 GEFA Loan* [10]

On February 7, 1992, Defendant's predecessor-in-interest the City of Augusta entered into an "Environmental Services Contract" with the Georgia EPD and GEFA for a loan (loan number SRF–91–033) to fund a project for "three flow equalization tanks, blowers, cascade aeration, sulfuric acid addition, chlorination and related appurtenances." Exhibit 1–2 at GEFA 00226. The principal balance of the loan, $4,653,193.00,[11] came from the state revolving loan fund established by capitalization grant from the EPA. *Id.*

As part of the loan contract signed by Defendant and the Georgia EPD and GEFA, Defendant agreed to certain terms and conditions. Included among these were:

1. LOAN

1.7 *Conditions precedent to disbursement of Loan Proceeds.*

In addition to any other prerequisites hereof, Authority's obligation to make disbursements under the loan shall be subject to satisfaction of the following conditions:

1.7.1 Local Government's representations and warrants [sic] shall remain true and correct.

1.7.2. No event of default shall have occurred under this contract or the promissory note.

Exhibit 1–2 at GEFA 00204.

3. REPRESENTATIONS AND WARRANTIES

3.2 *Pending Litigation.*

There are no actions, suits or proceedings, at law or in equity, in court or before any governmental or administrative agency, either pending or to the knowledge of Local Government reasonably to be considered threatened, which may impair the validity or enforceability of the promissory note or this contract or Local Government's ability to repay the loan or to construct and operate the project for revenue.

Exhibit 1–2 at GEFA 00208.

4. COVENANTS

4.7 *Compliance with Governmental Authority.*

Local Government shall comply with all environmental laws, rules and other provisions of legal force and effect and all such other provisions which govern the construction or operation

---

**10.** Defendant refers to the GEFA loans as the "1991, 1994, and 1995" loans. Defendant apparently refers to them this way because negotiations for the loans took place in 1991, 1994, and 1995. However, from the Court's review of the loan documentation contained in Exhibit 1, it is clear that the Environmental Services Contract for the "1991" loan was signed on February 7, 1992, and that the Environmental Services Contract for the "1995" loan was signed on September 19, 1996. *See* Exhibit 1–2, Exhibit 1–6. The promissory notes for these two loans were signed subsequent to each of the Environmental Services Contracts. The Court therefore will refer to the loans as the 1992, 1994, and 1996 loans because those were the years in which the loan contracts were actually signed.

**11.** The principal balance of the loan was originally $4,165,080.00. Compl. at 37. The loan was amended in 1993 and the principal balance was increased at that time to $4,653,193.00. Exhibit 1–3 at GEFA 00191.

of the Project or the water and sewer systems of Local Government.

Exhibit 1–2 at GEFA 00213.

### 5 EVENTS OF DEFAULT

The following occurrences shall constitute Events of Default hereunder:

5.1 Local Government fails to comply with any of the covenants, terms and conditions made in this contract;

5.2 Local Government defaults under the promissory note;

5.3 Any representation, warranty or statement made by Local Government in this contract or in connection with it or the loan shall be or become untrue, incorrect or misleading in any material respect;

Exhibit 1–2 at GEFA 00215.

### 7 GEORGIA STATE REVOLVING FUND PROVISIONS

7.1 *Submission to Federal Requirements.*

Local Government acknowledges and agrees that inclusion of this loan as a Georgia State Revolving Loan project will subject Local Government to provisions of federal law, set out in part in Title VI of the Federal Water Pollution Control Act ("Title VI") and to other provisions of federal law applying generally to federal financial assistance ... Local Government agrees to comply with such federally imposed requirements, regardless whether expressly set out herein, and further agrees that they may be enforced against Local Government by the Authority, the Director or the EPA Administrator.

Exhibit 1–2 at GEFA 00221.

The Environmental Services Contract also contains the following language regarding renewal of the representations and warranties contained within the con-

tract upon request for and acceptance of funds disbursed under the loan:

### 3. REPRESENTATIONS AND WARRANTIES

3.9 *Effect of Draw Request.*

Each request for and acceptance of disbursement shall be affirmation that the representations and warranties of this contract remain true and correct as of the date of the request and acceptance and that no breach of other provisions hereof has occurred. Unless [GEFA] is notified to the contrary, such affirmations shall continue thereafter.

Exhibit 1–2 at GEFA 00210.

Defendant executed a promissory note to the State Revolving Loan Fund on August 8, 1993. *See* Exhibit 1–3. The terms of the promissory note obligate Defendant to repay the principal sum of $4,653,193.00 plus interest. The promissory note also includes an acceleration clause, authorizing GEFA to declare the remaining principal and interest on the note due and payable immediately upon default by Defendant "in the performance of any terms, covenants or conditions of any agreement or other document concerning this promissory note, including without limitation the contract executed between [GEFA] and [Defendant] respecting this note." *Id.* at GEFA 00192–00193.

Payments under the 1992 GEFA loan commenced on April 1, 1994. Exhibit 1–3 at 00191. As of January 13, 2005, GEFA had disbursed $4,255,798.20. Defendant still owed $3,476,889.59 in principal and $877,832.91 in interest on the loan. Exhibit 1–1 at GEFA 00004. The Complaint contains no allegations of nonpayment by Defendant with respect to the 1992 GEFA loan.

## 2. *1994 GEFA Loan*

On October 25, 1994, Defendant's predecessor-in-interest the City of Augusta entered into an Environmental Services Contract with GEFA for an "Environmental Facilities Loan" (loan number 94–CS1WQ) to fund a project for "a sewer separation program for the City of Augusta which will eliminate combined sewer overflows." Exhibit 1–4 at GEFA 01942. The sewers targeted by the project were six that served the Messerly WWTP. Compl. at 40. Both the Georgia Department of Natural Resources and GEFA approved the project prior to GEFA's authorization of the loan to Defendant. *Id.* at GEFA 01925. The principal balance of the loan was $12,000,000.00. *Id.* at GEFA 01943.

As part of the loan contract signed by Defendant and GEFA, Defendant agreed to certain terms and conditions. Included among these were essentially identical terms and conditions to those for the 1992 GEFA Loan. However, the 1994 loan contract did not include the language regarding renewal of the representations and warranties contained within the contract upon request for and acceptance of funds disbursed under the loan, nor did it include the Georgia State Revolving Fund Provisions that were included in the 1992 GEFA loan contract. *See supra* section I.C.1; Exhibit 1–4.

Defendant executed a promissory note to GEFA on October 20, 1994. *See* Exhibit 1–5. The terms of the promissory note obligate Defendant to repay the principal sum of $12,000,000.00 plus interest. The promissory note contains a similar acceleration clause to the one for the 1992 GEFA loan: "in the performance of any of the terms, covenants or conditions of any agreement or other document concerning this promissory note, including without limitation the contract executed between [GEFA] and [Defendant] respecting this note." *Id.* at GEFA 01953.

Payments under the 1994 GEFA loan commenced on December 1, 1995. Exhibit 1–5 at GEFA 01952. As of January 13, 2005, the entire balance of the loan had been disbursed and Defendant had repaid the loan in full. Exhibit 1–1 at GEFA 00001.

## 3. *1996 GEFA Loan*

On September 19, 1996, Defendant entered into an Environmental Services Contract with the Georgia EPD and GEFA for a State Revolving Fund Loan (loan number SRF 95–001) to fund a project for improvements to the Messerly WWTP-specifically, construction of Phase I of the constructed wetlands system. Exhibit 1–5 at GEFA 01156. The principal balance of the loan was $6,150,000.00. *Id.* at GEFA 01157.

As part of the loan contract signed by Defendant, the Georgia EPD and GEFA, Defendant agreed to certain terms and conditions. The terms and conditions in the 1996 GEFA loan contract were essentially identical to those in the 1992 GEFA loan contract. *See supra* section I.C.1; Exhibit 1–6.

Defendant executed a promissory note to GEFA on August 20, 1996. *See* Exhibit 1–7. The terms of the promissory note obligate Defendant to repay the principal sum of $6,150,000.00 plus interest. The promissory note contains an acceleration clause, just like the promissory notes for the 1992 and 1994 loans:

If Local Government fails to make any payment of principal or interest when due, or if Local Government defaults in the performance of any of the terms, covenants or conditions of any agreement or other document concerning this promissory note, including without limitation the contract executed between Authority and Local Government respecting this note, Authority may de-

clare the principal of this obligation and all unpaid interest accrued on it to be due and payable immediately, without prior notice or demand to Local Government.

*Id.* at 2.

Payments under the 1996 GEFA loan commenced on September 1, 1997. *Id.* at 1. As of January 13, 2005, GEFA had disbursed $6,106,951.11 to Defendant and Defendant owed $5,235,179.26 in principal and $1,689,560.78 in interest on the 1996 GEFA loan. Exhibit 1–1 at GEFA 00006. The Complaint contains no allegations of nonpayment by Defendant with respect to the 1996 GEFA loan.

## II. *Relators' Claims*

Plaintiffs (hereinafter "Relators") filed this qui tam action in the name of the United States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3731 (2006), on June 15, 2005. The FCA provides, in pertinent part: "Any person who knowingly presents, or causes to be presented, to an officer or employee of the United States government ... a false or fraudulent claim for payment or approval" is "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ..." 31 U.S.C. § 3729(a) (2006).

The United States declined to intervene in the action on January 11, 2006, at which time the Court unsealed the complaint. Plaintiffs chose to exercise their right to conduct the action as qui tam relators and stand to receive a portion of any recovery therefrom. *See United States ex rel McDowell v. McDonnell Douglas Corp.,* 755 F.Supp. 1038 (M.D.Ga.1991).

Relators claim that Defendant obtained the three GEFA loans, the funds for which originated with the EPA, in violation of the FCA by knowingly making false state-

ments and false claims in the three loan applications and other documents. Relators allege that the terms and conditions of the GEFA Loans, as enumerated in Defendant's Environmental Services Contracts, required Defendant to disclose to GEFA its long history of noncompliance with federal and state environmental laws, its many violations of its own NPDES permits, and the various lawsuits and enforcement proceedings against Defendant by the Georgia EPD and by private entities. Relators submit that Defendant did not disclose any of this information to GEFA. Defendant's failure to disclose this information to GEFA, Relators argue, is tantamount to false statements and false claims for payment or approval by the United States Government. Relators assert that Defendant was never eligible for, nor entitled to, the GEFA loans.

Relators highlight specific sections of the Environmental Services Contracts to support their claim that Defendant was never eligible for the GEFA loans and obtained them by making false or fraudulent statements. Relators highlight the Environmental Services Contracts' requirement that Defendant "comply with all environmental laws, rules and other provisions ... which govern the construction or operation of the Project or the water and sewer systems of Local Government." *See* "4.7 Compliance with Governmental Authority," *supra* section I.C.1, Exhibit 1–2 at GEFA 00213. The contracts for the 1992 and 1996 GEFA Loans, which were both State Revolving Fund loans, also require that Defendant agree to comply with Title VI of the Federal Water Pollution Control Act and the EPA's Guidelines for State Revolving Loan Funds. *See* "7.1 Submission to Federal Requirements," *supra* section I.C.1, Exhibit 1–2 at GEFA 00221. Defendant's state of near-constant violation of its NPDES permits from 1982–2003 arguably conflicts with this require-

ment, as does Defendant's documented failure to effectively administer its Industrial Pretreatment Program or its Land Application of Sludge Program.

Relators also submit that the loans require Defendant to notify GEFA of pending litigation against it, including "actions, suits or proceedings ... in court or before any governmental or administrative agency," *see* "3.2 Pending Litigation," *supra* section I.C.1, Exhibit 1–2 at GEFA 00208. Relators allege that Defendant never notified GEFA of (1) the Georgia EPD audits and consent decrees imposed on the Messerly WWTP and/or the Butler Creek WPCP; (2) the lawsuit filed by Georgia Environmental Organization, Inc.; or (3) Relator Boyce's or Relator McElmurray's individual lawsuits against Defendant filed in state court.

Furthermore, Relators highlight language in the contracts that states that Defendant's representations and warranties to GEFA are conditions precedent to disbursement of the loan proceeds and "shall remain true and correct." *See* "1.7 Conditions precedent to disbursement of Loan Proceeds," *supra* section I.C.1, Exhibit 1–2 at GEFA 00204. Relators emphasize that, even if Defendant's representations to GEFA were true and correct at the time the parties entered into the Environmental Services Contracts, Defendant should have notified GEFA later of its subsequent environmental violations committed or suits filed against Defendant, and Defendant failed to do so.

Finally, the Environmental Services Contracts define "default" under the contracts as failure to comply with the covenants, terms and conditions of the contract. *See* "5 Events of Default," *supra* section I.C.1, Exhibit 1–2 at GEFA 00215. Each of the three promissory notes executed by Defendant contained an acceleration clause in case of default under the Environmental Services Contract. Relators

imply that any of the violations of the terms and conditions of the contracts discussed above constituted default, and that GEFA would have enforced the acceleration clauses had GEFA been aware of Defendant's default.

Relators allege that the United States is entitled to several forms of relief as a result of Defendant's violation of the FCA with respect to each of the three GEFA loans. First, Plaintiff contends that the Court should require Defendant immediately to repay the 1992 and 1996 GEFA loans in full- tantamount to enforcing on GEFA's behalf the acceleration clauses contained in the promissory notes for these two loans.

Second, Relators highlight the FCA's civil penalty provision and sum up their civil penalties claims as follows. Relators request that the Court order Defendant to pay treble damages based upon the total amounts of the three GEFA loans obtained from the United States Government. Alternatively, Relators ask that the Court order Defendant to pay treble damages based on the outstanding balances owed on the loans, plus the full amount of civil penalties for each false record produced and maintained by Defendant, plus all costs and attorneys' fees incurred by Relators. Relators also request a jury trial and "all other such relief as this Court determines to be appropriate."

### III. *Legal Discussion*

Defendant filed the instant Motion to Dismiss [# 16] on March 29, 2006, arguing that: (1) Relators' claims are barred by the FCA's statute of limitations; (2) Defendant's alleged false certifications of compliance with environmental laws were not "material" to GEFA's approval of the loans; (3) Relators' claims are based upon public disclosures and the Relators are not the original source; (4) Relators failed to

plead fraud with particularity; and (5) Relators do not allege that the government has suffered any cognizable damages.

On April 17, 2006, Relators filed a response in opposition to Defendant's motion [# 17]. The United States of America filed a statement of interest in Defendant's Motion to Dismiss on May 1, 2006[# 18] and expressed concern with Defendant's interpretation of the FCA, especially with regard to Defendant's materiality argument and Defendant's damages argument. Defendant filed a reply brief on May 4, 2006[# 20] and reiterated each of its six arguments that Relators' Complaint should be dismissed.

### A. *Standard of Review*

Defendant styles the instant Motion to Dismiss as a Rule 12(b)(6) motion. Def.'s Brief at 3. However, Defendant's arguments actually invoke three separate Federal Rules of Civil Procedure. Defendant's arguments numbered one, two and five are Rule 12(b)(6) challenges to the legal sufficiency of Relators' Complaint. Defendant's argument numbered three above is a Rule 12(b)(1) challenge to this Court's subject matter jurisdiction. Finally, Defendant's argument numbered four is a Rule 9(b) challenge to the particularity of Relators' Complaint with respect to the fraud allegations. Because the Court grants Defendant's Motion to Dismiss on the basis of Defendant's third argument alone, the Court recites only the standard of review for a 12(b)(1) motion below.

Federal Rule of Civil Procedure 12(b)(1) allows for dismissal based on a lack of subject matter jurisdiction. A party may make either a facial or factual challenge to a court's subject matter jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir.1990) (per curiam). A facial attack on subject matter jurisdiction "requires the court merely to look and see if [the] plaintiff has sufficiently alleged a ba-

sis of subject matter jurisdiction, and the allegations in his complaint are taken as true ..." *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir.1999), *quoting Lawrence*, 919 F.2d at 1529.

In this case, Defendant's argument that Relators' claims are based upon public disclosures and the Relators are not the original source of that information presents a facial challenge to the Court's subject matter jurisdiction. The FCA contains a subject matter jurisdiction provision for qui tam actions, 31 U.S.C. § 3730(e)(4)(A) (2000), and defendants rely on that provision for their third argument. § 3730(e)(4)(A) of the FCA states that no court has jurisdiction over an action based upon publicly disclosed information unless the action is brought by the original source of the information. The Court will accept all Relators' well-pleaded facts as true with respect to Defendant's FCA subject matter jurisdiction argument.

### B. *The False Claims Act*

The history of the False Claims Act has been discussed at length by other courts. *See, e.g., United States ex rel Williams v. NEC Corp.*, 931 F.2d 1493 (11th Cir.1991); *United States ex rel Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149 (3d Cir.1991) (hereinafter "Stinson"). Originally passed in 1863 during a period of fraud against the federal government in the form of false claims by Civil War profiteers, the purpose of the False Claims Act is to recover money fraudulently taken from the United States government. *United States ex rel Marcus v. Hess*, 317 U.S. 537, 551, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *see also United States ex rel Butler v. Magellan Health Serv., Inc.*, 74 F.Supp.2d 1201, 1204 (S.D.Fla. 1999). Congress struggled over the years with the qui tam provisions of the statute and amended it once in 1943 and again in

1986. *Butler,* 74 F.Supp.2d at 1205. The 1986 amendments were intended to draw a middle line between "increas[ing] private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who heard of fraud but played no part in exposing it." *Cooper v. Blue Cross and Blue Shield of Florida, Inc.,* 19 F.3d 562, 565 (11th Cir.1994) (hereinafter "Cooper"). Courts' analyses of claims filed under the act must be performed with these goals in mind. *Id.*

C. *Defendant's Argument Three: Relators' Claims Are Based Upon Public Disclosures and Relators Are Not the Original Source*

■ The False Claims Act restricts courts' jurisdiction over qui tam actions that are based on publicly disclosed information. The Act provides, in pertinent part:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2000). The FCA defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

Defendant argues that publicly disclosed information is the basis of Relators' complaint, namely, the Georgia EPD reports on which Relators rely for evidence of Defendant's environmental violations and the pleadings and discovery to which Relators cite that are from cases filed in the Superior Court of Richmond County and the Southern District of Georgia. Defendant also avers that Relators are not the original source of the information that is the basis for their suit. Defendant contends that Relators have neither direct nor independent knowledge of the publicly disclosed information that is the basis of their complaint. Defendant insists that Relators gained whatever knowledge they have about Defendant's alleged false claims second-hand from the efforts of the Georgia EPD or through documents filed in other civil litigation. Defendant opines that Relators have done nothing more than compile documents or reports already in the public domain.

Relators respond that there was no public disclosure of Defendant's alleged false claims. Relators contend that while much of the documentary evidence that allegedly proves Defendant's environmental violations may be considered publicly disclosed, the facts regarding the GEFA loans and the GEFA loan documents were not publicly disclosed in any of the methods described in § 3730(e)(4)(A). Additionally, Relators argue that they are the original source of information provided to the government. They assert that they have direct and independent knowledge of the information on which the allegations are based because they researched the laws and regulations regarding sewage sludge land application after they were each harmed by sludge applied to their lands, and as part of that process they collected extensive documentation supporting Defendant's violations of environmental laws. Relators claim that "[w]ithout [their] research, Defendant's misconduct never would have been exposed to the public." *Id.* at 16. Relators also contend that it

was through their independent research that Relators and the Department of Justice learned about Defendant's alleged false claims in order to procure the GEFA loans. Relators aver that the GEFA loan documents have never been the subject of any public disclosures and were only discovered through Relators' diligence.

The United States Court of Appeals for the Eleventh Circuit has condensed § 3730(e)(4) into a three part inquiry to determine if subject matter jurisdiction over a qui tam FCA claim exists: "(1) have the allegations made by the plaintiff been publicly disclosed; if yes, (2) is the publicly disclosed information the basis of plaintiff's suit; and, if yes (3) is plaintiff an 'original source' of that information." *Cooper*, 19 F.3d at 565 n. 4.

1. *Public Disclosure and Basis of Plaintiff's Suit*

All of the information upon which Relators base their Complaint is contained within the numerous documents attached to the Complaint as exhibits. The exhibits fall into four general categories: (1) information submitted to another court as part of prior litigation (see Exhibits 4, 5, 6, 7, 10); (2) information apparently disclosed as part of discovery in prior litigation (see Exhibits 2, 3, 8, 9, 11, 16, and 17); (3) orders issued by other courts in previous suits against Defendant (see Exhibits 15, 18 and 19); and (4) information obtained by Relators in order to file this litigation (see Exhibit 1). The first three of these categories raise questions about public disclosure under § 3730(e)(4)(A); the Court will address them in turn.

■ Exhibits 4, 5, 6, 7, and 10 are affidavits, expert reports, and statements that were filed with the Superior Court of Richmond County as part of Relators' individual lawsuits against Defendant regarding the alleged harm that Defendant's land application of sludge program caused to

their dairy herds. Documents such as these that are actually filed with the court are public disclosures under the FCA as part of a "civil hearing." *Butler*, 74 F.Supp.2d at 1208.

Exhibits 2, 3, 8, 9, 11, 16, and 17 were all apparently disclosed to Relators during the discovery phase of their individual lawsuits against Defendant. Relators refer to these documents as the product of their own "research" and "assimilation," however there is no indication in the Complaint or in Relators' Response to Defendant's Motion to Dismiss that Relators obtained any of these documents in any way other than through discovery in prior litigation. Discovery materials are public disclosures under the FCA. The United States Circuit Court of Appeals for the Third Circuit, in its widely-cited *Stinson* opinion, interpreted § 3730(e)(4)(A)'s language regarding "the public disclosure of allegations or transactions in a ... civil ... hearing" to mean that discovery material disclosed "to a party who is not under any court imposed limitation as to its use" is a public disclosure. *Stinson*, 944 F.2d at 1158; *see also Butler*, 74 F.Supp.2d at 1208. The Third Circuit explained its finding in *Stinson* that discovery materials are public disclosures by emphasizing that:

> many district courts have adopted local rules which provide that discovery materials should not be filed with the court except by order of the court. Such local rules do not generally preclude access by interested persons to nonfiled material. In fact, the Local Rules of some district courts provide that the court may order the filing of discovery materials at the request of any person who has an interest in reviewing the materials.

*Id.* at 1158–59. The Northern District of Georgia has a local rule of the type the *Stinson* court describes. Civil Local Rules 5.4A and 26.3A both state:

Interrogatories, requests for inspection, requests for admission, and answers and responses thereto shall be served upon other counsel or parties, but they shall not be filed routinely with the court. The party responsible for service of the material shall, however, file a certificate with the clerk indicating the date of service. Counsel shall also retain the original discovery material and become its custodian.

Northern District of Georgia Civil Local Rules (2006). Because Exhibits 2, 3, 8, 9, 11, 16, and 17 are materials disclosed in discovery in previous litigation and there is no indication in the Complaint or elsewhere that the documents were disclosed to Relators under protective order, and because the Northern District of Georgia's Local Rule regarding discovery is of the type the Third Circuit highlights in *Stinson,* this Court finds that 2, 3, 8, 9, 11, 16, and 17 are public disclosures under the FCA.[12]

Exhibits 15, 18 and 19 are, respectively, a copy of the 2003 judgment in Relator Boyce's individual lawsuit against Defendant; a copy of the Southern District of Georgia's Order granting plaintiff Georgia Environmental Organization Inc.'s motion for summary judgment in its lawsuit against Defendant; and a copy of a 1997 consent decree granted by the Southern District of Georgia upon plaintiff Georgia Environmental Organization Inc.'s motion for entry of consent decree. These court orders are by definition public records and it follows that they must also be public disclosures under the FCA.

Copies of the Environmental Services Contracts, Promissory Notes, and an Activity Statement for Defendant's 1992, 1994 and 1996 GEFA Loans comprise Exhibit 1. These documents contain all the information Relators cite in the Complaint regarding terms and conditions of the three GEFA loans, the dates of disbursement of funds under the loans, and the current repayment status of the loans. It is unclear from the exhibits how Relators obtained these documents. They may have been obtained as part of discovery in Relators' individual lawsuits against Defendant just as Exhibits 2, 3, 8, 9, 11, 16, and 17 were. Relators imply in the Complaint that they acquired the information about the loans' existence during discovery in their individual lawsuits. *See* Complaint at ¶¶ 60–62. If they indeed acquired this information during discovery in their previous lawsuits, Exhibit 1, like all the other Exhibits addressed above, would constitute a "public disclosure" under

---

12. The Court must also note that Exhibits 2, 3, 16 and 17 are reports and notifications prepared by the Georgia EPD and communicated to Defendant. These reports by a public agency seem to the Court to fit within the definition of public disclosure in § 3730(e)(4)(A): "No court shall have jurisdiction over an action ... based upon a[n] administrative report ... or audit." In fact, the Eighth Circuit has recognized audit reports by a state agency as administrative reports under § 3730(e)(4)(A). *See Hays v. Hoffman,* 325 F.3d 982, 988–89 (8th Cir. 2003)(where there is significant federal regulation and involvement in a state program, a report prepared by a state agency as part of that program meets the requirements for "administrative ... report [or] audit" under

§ 3730(e)(4)(A). However, the Third Circuit has rejected the idea that reports by state agencies can be public disclosures. *See United States ex rel Dunleavy v. County of Delaware,* 123 F.3d 734, 744–46 (3rd Cir.1997)(applying the doctrine of *noscitur a sociis* and holding that § 3730(e)(4)(A) applies only to administrative reports that originate with the federal government). Because the Eleventh Circuit has not yet ruled on the issue and because the Court feels an in-depth analysis of the federal government's involvement with the Georgia EPD is unnecessary in light of other pertinent facts, the Court will not decide at this stage whether Exhibits 2, 3, 16 and 17 independently meet the definition of public disclosure under § 3730(e)(4)(A) because they are "administrative reports."

§ 3730(e)(4)(A). Moreover, much of the basic information about Defendant's GEFA loans that is contained in Exhibit 1, such as the loan numbers, the years issued, the total amounts of the loans, and the projects for which Defendant obtained the loans, is available on GEFA's website for anyone to review. *See* www.gefa.org.

■ Whether Exhibit 1 consists of "public disclosures" under the FCA does not ultimately matter for resolution of the instant motion, however. Under § 3730(e)(4)(A), Relators' qui tam action cannot be "based upon" publicly disclosed information. The phrase "based upon" does not bar only those actions based *solely* upon publicly disclosed information; rather, it bars any qui tam action "based *in any part* upon publicly disclosed allegations or transactions." *United States ex rel Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548. 553 (10th Cir.1992) (emphasis added).

Even if Exhibit 1 does not contain publicly disclosed information, Relators cannot rely on Exhibit 1 alone to prove their FCA case. Exhibit 1 contains only the factual information about the GEFA Loans when, where, and under what conditions Defendant obtained federal funds to repair its water treatment facilities. All of the other exhibits contain the information Relators need in order to allege Defendant made false claims in violation of the FCA. Relators must base their claims at least in part upon the other documents that comprise the rest of Relators' exhibits, all of which are public disclosures in some form.

Because Relators base their claims at least in part on documents that constitute "public disclosures," Relators must be the "original source" of those documents in order for this Court to have subject matter jurisdiction over Relators' qui tam action under § 3730(e)(4).

## 2. *"Original Source"*

Section 3730(e)(4)(B) of the FCA defines original source as "an individual that has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." Although the Eleventh Circuit has not construed this portion of the FCA, the Court finds a case from the United States Court of Appeals for the Second Circuit to be factually apposite to this case and determinative in its § 3730(e)(4)(B) analysis of Relators' Complaint.

In *United States ex rel Kreindler & Kreindler v. United Technologies Corporation,* 985 F.2d 1148, 1152 (2d Cir.1993), the Second Circuit reviewed relator Kreindler & Kreindler's ("Kreindler") qui tam FCA suit against United Technologies Corporation ("UTC") for false claims for payment made by UTC under its contract with the U.S. Army for the manufacture of Black Hawk helicopters. Kreindler based its claims on information it obtained from UTC during discovery in another lawsuit, a wrongful death action against UTC. In that action, Kreindler had represented the widow of a man killed in the crash of one of the Black Hawk helicopters UTC manufactured under the Army contract. *Id.* at 1150. Although the wrongful death lawsuit settled in 1987 prior to trial, the information disclosed to Kreindler during discovery in the action apparently piqued its interest in the terms of UTC's contract with the Army and UTC's conduct under the contract. *Id.* at 1150–51. After performing some independent investigation and research based on what it learned from the discovery materials in the wrongful death case, Kreindler filed a qui tam action under the FCA in December 1987, alleging that "UTC knowingly violated its

government contract and presented false or fraudulent claims for payment of over 700 Black Hawk helicopters." *Id.* at 1152. UTC moved to dismiss on standing grounds, but the district court determined that the action was barred by the FCA's statute of limitations. *Id.* at 1152–53. The district court declined to address UTC's § 3730(e)(4) subject matter jurisdiction argument, but, on appeal, the Second Circuit found that issue to be the dispositive one. *Id.* at 1153, 1157.

After first concluding that Kreindler based its claim on discovery material from the wrongful death action, and that discovery material is a "public disclosure" under § 3730(e)(4)(A), the Second Circuit turned to § 3730(e)(4)(B) to determine whether Kreindler was an "original source" of the information in the discovery material. Although Kreindler "conducted, as counsel, the litigation that *resulted in* public disclosure of information concerning Black Hawk helicopters upon which Kreindler relie[d] to bring the qui tam action," the Second Circuit emphasized that it was "UTC and its employees who were the original sources of the information disclosed in that litigation." *Id.* at 1159 (emphasis added).

The Second Circuit concluded that Kreindler had no significant direct knowledge "independent of the disclosures made to [it] by UTC." *Id.* The fact that Kreindler had "conducted some collateral research and investigations" was not enough to establish direct and independent knowledge within the meaning of § 3730(e)(4)(B); research and investigation of this kind "would be customary in such litigation." *Id.* The Second Circuit also noted that "the fact that Kreindler's background knowledge enabled it to understand the significance of the information acquired in the [wrongful death] action" did not make Kreindler's knowledge "independent of the publicly disclosed in-

formation." *Id.* "If that 'were enough to qualify the relator as an 'original source,'" the Second Circuit concluded, "then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase." *Id.* (quoting *Stinson,* 944 F.2d at 1160).

Relators, like Kreindler, are not the original source of the information upon which they base their complaint. Relators obtained the information on which they base their allegations during discovery in previous, separate lawsuits filed against Defendant. The Georgia EPD and its employees, like UTC and its employees in *Kreindler,* were the source of most of the information Relators obtained during discovery, although Relators obtained some of the documents from other sources as well. Relators did perform some independent research and investigation as a result of what they learned from the discovery materials, but research and investigation are customary in litigation of this kind. The fact that Relators' background knowledge of- indeed, personal experience with- Defendant's environmental violations enabled them to understand the significance of the information they acquired in their individual lawsuits against Defendant does not mean that they had knowledge independent of the publicly disclosed information.

Because Relators base their lawsuit against Defendant on publicly disclosed information in violation of § 3730(e)(4)(A) and Relators are not the original sources of that information under § 3730(e)(4)(B), the Court GRANTS Defendant's Motion to Dismiss for lack of subject matter jurisdiction.

### F. *Defendant's Remaining Arguments*

Because the Court finds that Defendant's Motion to Dismiss should be granted based upon Defendant's argument three

alone, the Court declines to review Defendant's arguments one, two, four and five.

## IV. *Conclusion*

For the foregoing reasons, Defendants' Motion to Dismiss [# 16] for lack of subject matter jurisdiction is GRANTED.

SO ORDERED.